ACCEPTED
14-14-00589-CV
FOURTEENTH COURT OF APPEALS
HOUSTON, TEXAS
4/8/2015 5:35:50 PM
CHRISTOPHER PRINE
CLERK

**No. 14-14-00589-CV**

# In the
# Fourteenth Court of Appeals
# Houston, Texas

FILED IN
14th COURT OF APPEALS
HOUSTON, TEXAS
4/8/2015 5:35:50 PM
CHRISTOPHER A. PRINE
Clerk

**1717 BISSONNET, LLC,**

*Appellant*,

**vs.**

**PENELOPE LOUGHHEAD, ET AL,**

*Appellees*.

ON APPEAL FROM THE 157TH JUDICIAL DISTRICT
COURT OF HARRIS COUNTY, TEXAS

**APPELLANT'S BRIEF**

Ramón G. Viada III
State Bar No. 20559350
VIADA & STRAYER
17 Swallow Tail Court, Suite 100
The Woodlands, Texas 77381
(281) 419-6338
(281) 661-8887 (Fax)
Email: rayviada@viadastrayer.com

H. Fred Cook
State Bar No. 04732500
WILSON, CRIBBS & GOREN, P.C.
2500 Fannin Street
Houston, Texas 77002
(713) 222-9000
(713) 229-8824 (Fax)
Email: hfcook@wcglaw.net

ATTORNEYS FOR APPELLANT
1717 BISSONNET, LLC

ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

**Page**

IDENTITY OF PARTIES AND COUNSEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

INDEX OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

I.   STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III. ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.  STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     A.   The Project & Its Surroundings . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     B.   Pre-Suit Controversy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     C.   Liability Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     D.   Alleged Future Impacts of the Project . . . . . . . . . . . . . . . . . . . . . . . . . 9

         1.   Traffic Congestion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

         2.   Shadow Effect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

         3.   Invasion of Privacy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

         4.   Foundation Damage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

         5.   Excessive Garage Lighting . . . . . . . . . . . . . . . . . . . . . . . . . 13

         6.   Construction Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

         7.   Diminution of Market Value . . . . . . . . . . . . . . . . . . . . . . . . 15

     E.   Pertinent Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . 17

V.   SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

VI.   ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      A.    Standard of Review  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      B.    No Tort Finding Supports the Damage Award  . . . . . . . . . . . . . . . . . . . . . . . 21

      C.    The Plaintiffs Waived Damages by Failing to Request the District
           Court to Submit a Claim for Which Damages Are Recoverable  . . . . . . . . . . 25

      D.    No Evidence Exists to Prove That Plaintiffs' Damages Were
           Proximately Caused by Any Actionable Nuisance  . . . . . . . . . . . . . . . . . . . . 26

      E.    No Evidence Supports the Applicability of Strict Liability  . . . . . . . . . . . . . 29

           1.      Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

           2.      *Tyler v. Likes*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

           3.      *Rylands* and the Restatement:  Strict Nuisance Liability in Texas for
                 Ultrahazardous and Inherently Dangerous Conditions  . . . . . . . . . . . 34

           4.      Strict Liability Does Not Apply to 1717's Proposed
                 Apartment Building  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

      F.    No Pleadings Exist to Support Claims Based on Excessive Light and
           Construction-related Annoyances  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

      G.    There Is No Evidence That the Project, If Built, Will Substantially
           Interfere with the Use and Enjoyment of Non-Abutting Plaintiff
           Properties  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

           1.      No Non-Abutting Plaintiff Will Experience Foundation
                 Damage  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

           2.      Any Increase of Traffic on Public Streets Will Not Constitute
                 Substantial Interference with the Use and Enjoyment of the
                 Non-Abutting Plaintiffs' Properties  . . . . . . . . . . . . . . . . . . . . . . . . . 44

           3.      Shadow from the Tower Will Not Constitute Substantial
                 Interference  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

4. Visual Access to the Non-Abutting Plaintiffs' Yards and Window Exteriors Will Not Constitute Substantial Interference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

5. The Garage Lighting Will Not Constitute Substantial Interference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

6. Construction Activity Will Not Constitute Substantial Interference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

H. Three Plaintiffs Failed to Prove Ownership . . . . . . . . . . . . . . . . . . . . . . . . . 50

I. 1717 Should Recover Taxable Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

VII. PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

APPENDIX

1. Jury Charge (CR 730-40)

2. May 1, 2014, Opinion & Order (CR 1199-1217)

3. Final Judgment (CR 1271-75)

4. Artist Drawings (DX 43)

5. Diagram (DX 167)

6. Defendant's Charge Objections (14 RR 14-30)

# IDENTITY OF PARTIES AND COUNSEL

**PARTIES TO THE TRIAL COURT'S ORDER:**

| | |
|---|---|
| 1717 Bissonnet, LLC | Defendant/Appellant |
| | |
| Luong Nguyen | Plaintiffs/Appellees |

Lam Nguyen and Katherine Hoang, jointly
Jamie Flatt
Penelope Loughhead
Donald Verplanken
Norman and Suannah Rund, jointly
Achim and Diana Bell, jointly
Jeanne Meis
Mary Van Dyke
Ralph and Leslie Miller, jointly
Yin and Surong Zhang, jointly
Martha Gariepy
Stephen Roberts
Suzanne Powell
Michelle Jennings and Michael Tetzlaff, jointly
James and Allison Clifton, jointly
Kimberly Bell
Richard and Mary Baraniuk, jointly
Kenneth Reusser and Xanthi Couroucli, jointly
Earle Martin
Dinzel Graves
Sarah Morian
Michael Clark
Marc Favre-Massartic
Raja Gupta
Laura Lee & Dico Hassad
Peter & Adriana Oliver
Ed Follis
Frank & Jeanette Stokes
Steven Lin
Yi-Wen Michelle Pu
Howard Epps
Phyllis Epps

**TRIAL AND APPELLATE COUNSEL:**

**For Appellant**:

Ramón G. Viada III                                    Trial and Appellate Counsel
State Bar No. 20559350
VIADA & STRAYER
17 Swallow Tail Court, Suite 100
The Woodlands, Texas 77381
(281) 419-6338
(281) 419-8137 (Fax)
Email:   rayviada@viadastrayer.com

H. Fred Cook                                          Trial and Appellate Counsel
State Bar No. 04732500
WILSON, CRIBBS & GOREN, P.C.
2500 Fannin Street
Houston, Texas  77002
(713) 222-9000
(713) 229-8824 (Fax)
Email:  hfcook@wcglaw.net

**For Appellees:**

Jean C. Frizzell                                      Trial and Appellate Counsel
State Bar No. 07484650
REYNOLDS, FRIZZELL, BLACK, DOYLE,
ALLEN AND OLDHAM LLP
1100 Louisiana Street, 3500
Houston, Texas 77002
713-485-7200
713-485-7250 (Fax
Email:  jfrizzell@reynoldsfrizzell.com

# INDEX OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Albig v. Mun. Auth.y of Westmoreland County*,
    502 A.2d 658 (Pa. Super. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Allen v. City of Tex. City*,
    775 S.W.2d 863 (Tex. App.—Houston [1st Dist.] 1989, writ denied) . . . . . . . . . . 22

*Ashley v. Bizzell*,
    694 S.W.2d 349 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.) . . . . . . . . . . . . 51

*Barnes v. Mathis*,
    353 S.W.3d 760 (Tex. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Bible Baptist Church v. City of Cleburne*,
    848 S.W.2d 826 (Tex. App.—Waco 1993, writ denied) . . . . . . . . . . . . . . . . . 32, 33

*Bily v. Omni Equities, Inc.*,
    731 S.W.2d 606 (Tex. App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.) . . . 36, 37

*Branch v. W. Petroleum, Inc.*,
    657 P.2d 267 (Utah 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Braxton v. Chin Tuo Chen*,
    No. 06-10-00134-CV, 2011 Tex. App. LEXIS 7414, 2011 WL 4031171
    (Tex. App.—Texarkana Sept. 13, 2011, pet. denied) (mem op.) . . . . . . . . . . . . . . 23

*C. & R. Transport, Inc. v. Campbell*,
    406 S.W.2d 191 (Tex. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*California Tahoe Regional Planning Agency v. Jenkins*,
    591 F.2d 181 (9th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*California v. Ciraolo*,
    476 U.S. 207 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*City of Houston v. Renault, Inc.*,
    431 S.W.2d 322 (Tex. 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

*City of Keller v. Wilson*,
    168 S.W.3d 802 (Tex. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*City of San Antonio v. Stumburg*,
    70 Tex. 366, 7 S.W. 754 (1888) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*City of Somerset v. Sears*,
    313 Ky. 784, 233 S.W.2d 530 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*City of Texarkana v. Taylor*,
    490 S.W.2d 191(Tex. Civ. App.–Texarkana 1972, writ ref'd n.r.e.) . . . . . . . . . 32, 33

*City of Tyler v. Likes*,
    962 S.W.2d 489 (Tex. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31-34

*Corley v. Exxon Pipeline Co.*,
    821 S.W.2d 435 (Tex. App.—Houston [14th Dist.] 1991, *writ denied*) . . . . . . . . . . 22

*Dallas Land & Loan Co. v. Garrett*,
    276 S.W. 471 (Tex. Civ. App.—Dallas 1925, no writ) . . . . . . . . . . . . . . . . . . . 25, 39

*Fontainebleau Hotel Corp. v. Forty-five Twenty-five, Inc.*,
    114 So. 2d 257 (Fla. App. 1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Ford Motor Co. v. Ledesma*,
    242 S.W.3d 32 (Tex. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Freedman v. Briarcroft Property Owners, Inc.*,
    776 S.W.2d 212 (Tex. App.—Houston [14th Dist.] 1989, pet. denied) . . . . . . . . . . 50

*Gotcher v. City of Farmersville*,
    137 Tex. 12, 151 S.W.2d 565 (Tex. 1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

*Graves v. Diehl*,
    958 S.W.2d 468 (Tex. App.—Houston [14th Dist.] 1997, no writ) . . . . . . . . . . . . . 50

*GTE Mobilnet of S. Texas Ltd. Pshp. v. Pascouet*,
    61 S.W.3d 599 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) . . . . . . . . . . . 48

*Hanson Aggregates W., Inc. v. Ford*,
    338 S.W.3d 39 (Tex. App.—Austin 2011, pet. dism'd) . . . . . . . . . . . . . . . . . . . 30, 33

*Helix Land Co. v. City of San Diego*,
  82 Cal. App. 3d 932, 147 Cal. Rptr. 683 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Houston Gas & Fuel Co. v. Harlow*,
  297 S.W. 570 (Tex. Civ. App.—Houston 1927, no writ) . . . . . . . . . . . . . . . . . . . . . 25

*Houston Unlimited, Inc. v. Mel Acres Ranch*,
  443 S.W.3d 820 (Tex. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26-28

*Ingram v. Turner*,
  125 S.W. 327 (Tex. Civ. App.—Fort Worth 1910, writ ref'd) . . . . . . . . . . . . . . . . . 45

*Internacional Realty, Inc. v. 2005 RP West, Ltd.*,
  449 S.W.3d 512 (Tex. App.—Houston [1st Dist.] 2014, no pet.) . . . . . . . . . . . . . . 20

*Justice v. CSX Transp., Inc.*,
  908 F.2d 119 (7th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Klein v. Gehrung*,
  25 Tex. 232 (Tex. 1860) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Latch v. Gratty, Inc.*,
  107 S.W.3d 543 (Tex. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Manuel v. Cresleigh Homes Corp.*,
  2007 Cal. App. Unpub. LEXIS 9789 (Cal. App. 3d Dist. Dec. 4, 2007) . . . . . . . . 49

*Mapco, Inc. v. Carter*,
  817 S.W.2d 686 (Tex. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Maranatha Temple, Inc. v. Enterprise Products Co.*,
  893 S.W.2d 92 (Tex. App.—Houston [1st Dist.] 1994, writ denied) . . . . . . . . . . . 24

*McQueen v. Burkhart*,
  290 S.W.2d 577 (Tex. Civ. App.—Austin 1956, no writ) . . . . . . . . . . . . . . . . . . . . 45

*N. Little Rock Transp. Co. v. Finkbeiner*,
  243 Ark. 596, 420 S.W.2d 874 (Ark. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Parson v. Texas City*,
  259 S.W.2d 333 (Tex. Civ. App.—Fort Worth 1953, writ ref'd) . . . . . . . . . . . . . . 34

*Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*,
    77 S.W.3d 253 (Tex. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Rutter v. Carroll's Foods of the Midwest, Inc.*,
    50 F. Supp. 2d 876 (N.D. Iowa 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Rylands v. Fletcher*,
    L.R. 1 Ex. 265 (1866), *aff'd.* L.R. 3 H.L. 330 (1868) . . . . . . . . . . 18, 31-34, 37, 41, 42

*Sanders v. Miller*,
    52 Tex. Civ. App. 372, 113 S.W. 996 (Texarkana — 1908, no writ) . . . . . . . . . 22-24

*Schneider Nat. Carriers, Inc. v. Bates*,
    147 S.W.3d 264 (Tex. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 24

*Soap Corporation of America v. Balis*,
    223 S.W.2d 957 (Tex. Civ. App.—Fort Worth 1949, writ ref'd n.r.e.) . . . . . . . . . . 44

*Southeastern Pipe Line Co. v. Tichachek*,
    997 S.W.2d 166 (Tex. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Spencer v. Eagle Star Insurance Co.*,
    876 S.W.2d 154 (Tex. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*St. Joseph Hosp. v. Wolff*,
    94 S.W.3d 513 (Tex. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*State Dep't of Highways & Pub. Transp. v. Payne*,
    838 S.W.2d 235 (Tex. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*State ex rel. Reich v. City of Beachwood*,
    158 Ohio App. 3d 588, 820 N.E.2d 936 (2004) . . . . . . . . . . . . . . . . . . . . . . . . 49

*State v. Crea*,
    305 Minn. 342, 233 N.W.2d 736 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*State v. Dickerson*,
    313 N.W.2d 526 (Iowa 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*State v. Heal*,
    917 S.W.2d (Tex. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Thurow v. City of Dallas*,
499 S.W.2d 347 (Tex. Civ. App.—Dallas 1973, writ ref'd n.r.e.) . . . . . . . . . . . . . . 25

*United States v. Conrad*,
578 F. Supp. 2d 1016 (N.D. Ill. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*United States v. Johnson*,
561 F.2d 832 (D.C. Cir.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*Valentine v. Pioneer Chlor Alkali Co.*,
864 P.2d 295 (Nev. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Vaughn v. Drennon*,
202 S.W.3d 308 (Tex. App.—Tyler 2006, no pet.) . . . . . . . . . . . . . . . . . . . . . . . . 48

*Wallace v. Horn*,
506 S.W.2d 325 (Tex. Civ. App. —Corpus Christi 1974, writ ref'd n.r.e.) . . . . . . . 44

*West v. City of Waco*,
116 Tex. 472, 294 S.W. 832 (1927) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

## Statutes and Rules

TEX. R. APP. P. 43.2(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

TEX. R. CIV. P. 131 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

TEX. R. CIV. P. 301 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

TEX. R. EVID. 201(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

## Treatises and Law Reviews

CIVIL PRACTICE IN DISTRICT & COUNTY COURTS §17.31 (1984 & Supp. 1988) . . . . . . . .  20

W. Page Keeton, PROSSER & KEETON ON THE LAW OF TORTS,
     § 78 (5th Ed. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33, 42

W. Page Keeton, PROSSER & KEETON ON THE LAW OF TORTS,
     § 88B (5th Ed. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

Prosser, *Nuisance Without Fault*, 20 TEX. L. REV. 399 (1942) . . . . . . . . . . . . . . .  32-34, 38

RESTATEMENT (1st) OF TORTS § 822(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

RESTATEMENT (1st) OF TORTS § 833 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

RESTATEMENT (2d) OF TORTS § 520 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

RESTATEMENT (2d) OF TORTS § 817 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

RESTATEMENT (2d) OF TORTS § 821B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21, 24, 44, 45

RESTATEMENT (2d) OF TORTS § 821C . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  45

RESTATEMENT (2d) OF TORTS § 822 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21, 44

RESTATEMENT (2d) OF TORTS § 833 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  35

RESTATEMENT (3d) OF TORTS § 20 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31, 40, 41

RESTATEMENT (3d) OF TORTS § 20(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  37

RESTATEMENT (3d) OF TORTS, § 320 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

# In the
# Fourteenth Court of Appeals
# Houston, Texas

**1717 BISSONNET, LLC,**

*Appellant*,

**vs.**

**PENELOPE LOUGHHEAD, ET AL,**

*Appellees*.

## APPELLANT'S BRIEF

Appellant 1717 Bissonnet, LLC (hereinafter, "1717") appears to complain of error in the judgment of the court below and to file this appellant's brief in support of the relief requested herein.

## I.   STATEMENT OF THE CASE.

This a nuisance case. Defendant-Appellant, 1717, plans to build a high rise apartment building on a 1.6 acre tract located at 1717 Bissonnet Road. 1717 has cleared the land for construction, but the building has not yet been built. Plaintiffs below claim they own thirty residential properties located near 1717's project site. *See* 7th Amended Pet. (CR 417-32).

Over timely objection, the case was tried to a jury on the theory of strict liability – nuisance without fault. *See* Jury Charge (CR 730-40) (Appendix 1). The jury found that 1717's

proposed project, if built, would constitute a nuisance for twenty of the thirty plaintiff properties. (CR 733-35). The jury also awarded loss of market value damages and loss of use and enjoyment damages for the plaintiffs who allegedly own the twenty affected properties (hereinafter, the "Prevailing Plaintiffs"). (CR 736-38).

The trial court denied the plaintiffs' petition to permanently enjoin the construction of the project, but awarded lost market value damages to the Prevailing Plaintiffs (approximately $1.22 million), plus post-judgment interest and taxable costs. *See* May 1, 2014, Opinion & Order (CR 1199-1217) (Appendix 2); Final Judgment (CR 1271-75) (Appendix 3). The trial court granted 1717's motion for judgment against the plaintiffs who owned the remaining ten properties (hereinafter, the "Losing Plaintiffs"), awarded 1717 a portion of its taxable costs against the Losing Plaintiffs, and disregarded the jury's award of use and enjoyment damages as unripe. *Id*. This appeal followed. (CR 1285-86).

## II.    STATEMENT REGARDING ORAL ARGUMENT.

This is an appeal from a judgment of $1.22 million. The jury found that 1717's proposed high rise building, if built, will constitute a nuisance for the alleged owners of twenty nearby properties. Separate damage awards were made for each of the Prevailing Plaintiffs. The record is large. The trial lasted almost a month. Thirty-seven witnesses testified, and hundreds of exhibits were admitted.

Although 1717's first point of error involves the application of hornbook law to an immaterial jury finding of damages, the subsidiary issues are fact-specific and will require

2

familiarity with the large trial record. Appellant believes that oral argument will assist the Court in clarifying these subsidiary issues.

## III. ISSUES PRESENTED.

(1)    The damage findings are immaterial. A prospective, contingent nuisance is not a tort that can support an award of damages. Accordingly, there is no liability finding that supports the jury's award of market value damages in this case.

(2)    The Prevailing Plaintiffs waived recovery of damages by failing to request the district court to submit a liability question which could support a damage award.

(3)    Even if, hypothetically, lost market value were recoverable in a nuisance case where the alleged nuisance does not yet exist, the plaintiff must still prove that the diminution of the property's value proximately resulted from the alleged future nuisance. In this case, the Prevailing Plaintiffs failed to prove that the loss of market value of each of their properties was proximately caused by an actionable future nuisance and not by some other cause.

(4)    As a matter of law, the doctrine of strict liability (nuisance without fault) does not apply on this record. Hence, the jury's liability finding for each of the Prevailing Plaintiffs should be disregarded and cannot support the jury's award of damages.

3

(5)     No evidence exists to prove the project, if built, will be abnormal and out of place in its relevant surroundings.  Hence, the jury's liability finding for each of the Prevailing Plaintiffs is unsupported by legally sufficient evidence.

(6)     The Prevailing Plaintiffs failed to plead that the proposed garage lighting of the Project, if built, creates a nuisance.  Hence that claim cannot support the judgment for those Plaintiffs.

(7)     The Prevailing Plaintiffs failed to plead that annoyances resulting from the construction of the Project will create a nuisance.   Hence that claim cannot support the judgment for those Plaintiffs.

(8)     No evidence exists to prove that the Project, if built, will substantially and unreasonably interfere with the use and enjoyment of any of the non-abutting Plaintiff properties, *i.e*., the properties of

(a)     Lam Nguyen & Katherine Huong;

(b)     Suzanne Powell;

(c)     Michelle Jennings & Michael Tetzlaff;

(d)     James & Allison Clifton;

(e)     Kimberly Bell;

(f)     Richard & Mary Baraniuk;

(g)     Kenneth Reusser & Xanthi Couroucli;

(h)     Stephen Roberts;

4

(i)     Earle Martin; and

(j)     Norman & Suannah Rund.

Hence, the jury's liability finding for each of these Prevailing Plaintiffs is unsupported by legally sufficient evidence.

(9)     No evidence exists to prove that any of the following Prevailing Plaintiffs owned any justiciable interest in their *alleged* properties as of the time of trial –

(a)     Martha Gariepy, and

(b)     James & Allison Clifton.

Accordingly, these Plaintiffs had no standing to bring this suit.

(10)    The district court erred in its cost award.

## IV.    STATEMENT OF FACTS.

### A.     The Project and Its Surroundings.

The term "Project" is defined by the jury charge to mean "the 21-story mixed use building that 1717 Bissonnet proposes to construct at the corner of Bissonnet Road and Ashby St." (CR 732). Artist drawings of the completed building were admitted as DX 43 and are attached to this Brief as Appendix 4. The Project is currently permitted for 232 units and 10,075 square feet of restaurant space. (10 RR 230).

Bissonnet Road is a major collector street that accommodates some 14,000 cars per day. (9 RR 218-23; 11 RR 240-41; PX 38). The portion of the road adjacent to the Project is 36-38 feet wide. (12 RR 128-29). Parking is allowed on both sides of the road during off hours.

5

Parking is prohibited on the eastbound side during the morning rush hour, and is prohibited on the westbound side during evening rush hour. (9 RR 230-1). The road is wide enough for traffic to go around stopped vehicles waiting to turn left. (5 RR 242; 9 RR 231-32; 11 RR 238-39; *see also* DX 254 (video showing cars passing left turning vehicles); 12 RR 82-95).

Historically, the Project site was used as a strip center for a variety of local businesses. (3 RR 106-07; 11 RR 6; DX 154). In 1976, the site was used for a two-story apartment complex of 67 units, called the Maryland Manor Apartments. (10 RR 224-25). These apartments were built within one to two feet of the southern and eastern property lines, abutting the Plaintiffs' lots on Wroxton Court and Southampton Estates. (10 RR 206). Until razed in May 2013, these buildings cast shadows and afforded visual access to surrounding backyards and window exteriors. (3 RR 107-09; 4 RR 59-60; 7 RR 100-01; 10 RR 205-13; DX 2).

Although there is abundant testimony in the record concerning the character of the immediate neighborhood surrounding the Project site, as well as the character of the wider surrounding area characterized by the Museum District, the Medical Center, and Rice University, much of the urban landscape is a matter of which the Court can take judicial notice. *See* TEX. R. EVID. 201(b). There are several mid-rise (4 to 6 story) apartment buildings within a five block radius of the Project site, as well as several small businesses, including restaurants. The 6-story Medical Clinic of Houston is 4 blocks away. (9 RR 211-17, 226-27, 242-45; 10 RR 192; 11 RR 77-78; 13 RR 22-23; DX 21 # 56130; DX 42; DX 46).

With the growth of Houston's population has come an increased demand for housing. (9 RR 240-42). Higher density drives up cost of land, which, in turn, raises the urban skylines.

6

All over the inner city of Houston are high-rise developments in close proximity to single-family neighborhoods. (*See, e.g.*, 5 RR 158-207; 11 RR 73-91; DX 42; DX 105 (Video)).

## B. Pre-Suit Controversy.

The district court's memorandum opinion describes the salient facts of the pre-suit controversy. (CR 1199-1201). Two aspects are pertinent to 1717's appeal.

First is the yard sign campaign demonizing the Project as a toothed monster and a "Tower of Traffic." Hundreds, if not thousands, of these yard signs posted throughout the neighborhood have slandered the Project and also self-slandered the marketability of properties near the Project. (4 RR 58-59). The point to be made in this connection is that the Plaintiffs' claim for stigma damages – which they allege to be the result of a "nuisance" that does not physically exist – does not take into account the market reaction to misinformation propagated by the yard sign campaign.

Second, 1717's suit with the City of Houston ended in a Settlement Agreement (DX 9; 11 RR 49-50), that imposes specific use restrictions on the property, including traffic mitigation and light screening. Those restrictions run with the land and have been recorded. Otherwise, the 1717 tract is not deed restricted. (13 RR 29-30).

## C. Liability Findings.

Over 1717's *Casteel* objection (*see* 14 RR 10-13), the Court asked a single liability question as to each of the thirty plaintiff properties in question – essentially, will the Project constitute a nuisance for each such property if the Project is built? (CR 733). The Court defined a "nuisance" to include a low standard of harm – interference that amounts to "more than a

slight inconvenience or petty annoyance." (*Id.*) Embedded within this single, global liability question were several distinct theories of nuisance, none of which the jury addressed specifically in its global finding of nuisance:

(i)  **traffic** – claims that high density would increase future traffic and cause delays at the public intersection at Bissonnet and Dunlavy, which in turn would divert traffic through the area subdivisions, increase parking on side streets, and allegedly delay the deployment of emergency services;

(2)  **privacy** – an alleged future invasion of privacy via views from the windows and other vantage points on the high rise, into backyards and of the exterior of windows of the Plaintiffs' houses;

(3)  **foundation damage** – settlement around the foundation of the Project that would allegedly extend to, and damage, the foundations of fence-line plaintiff properties;

(4)  **shadow** – the shadow to be cast by the prospective building on Plaintiffs' lots would allegedly damage decorative plants and interfere with the Plaintiffs' enjoyment of the sunshine through their windows;

(5)  **"abnormal and out of place"** – the sheer size of the proposed building is unbefitting to the surrounding neighborhood;

(6)  **excessive light** – from the proposed parking garage;

8

(7) **construction-related annoyances** – irritations from the future construction of the Project (noise, vibrations, worker traffic, dust, etc.); and

(8) **diminution of value** - alleged loss of current value due to the prospect of the proposed Project being built.

It is impossible, by deductive reasoning, to determine exactly which of the alleged impacts presented to the jury, or combination of impacts, were relied upon by at least ten jurors to support each "yes" answer to the liability questions. All the Court can really know from the answers to Question 1 is that the jury – using a preponderance of the evidence standard – found that the Project, as it was proposed to be built as of the time of trial, will constitute a nuisance in some undefined way for twenty properties if it were later built.

D.     **Alleged Future Impacts of the Project.**

1.     Traffic Congestion.

The Project, when complete, will add approximately 7% more rush hour traffic to Bissonnet. (5 RR 223-33). Plaintiffs' theory of traffic congestion, however, is only indirectly related to this small increase. Traffic expert Jason Knesek attempted to show that an increased volume of cars turning into the Project during peak PM hours (4:00 to 6:00 PM) would cause time-consuming bottlenecks. According to Knesek, left-turning vehicles attempting to enter the Project from the westbound lane of Bissonnet would frequently encounter eastbound traffic on Bissonnet and be forced to stop and wait for an opening in order to make the turn. When the turning vehicle stopped, vehicles behind it, Knesek opined, would also be forced to stop. These

9

cues, according to Knesek, would extend across the southbound lane of Dunlavy (north of the Project). The gridlock at the Bissonnet-Dunlavy intersection, he predicted, would cause 5 minute delays. (PX 5; 5 RR 148-93). Mr. Knesek also opined that added traffic from the Project would create a smaller bottleneck for northbound cars turning onto Bissonnet from Ashby Street – resulting in approximately 2.5 minute delays during peak PM hours. (5 RR 151-58).

Knesek's traffic congestion model is based upon a key assumption he admitted to be false. Bissonnet is wide enough to allow cars to go around a vehicle that is stopped and waiting to turn left. Knesek and many of the Plaintiffs[1] admitted to witnessing cars passing left turning vehicles in this manner on Bissonnet. (5 RR 242). Knesek's congestion model is also limited to the peak PM hours, when traffic in Houston is a city-wide problem. (5 RR 239-40). He does not predict any permanent traffic jams.

And even more importantly for this appeal, Knesek did not show how any of the predicted congestion would significantly affect the use and enjoyment of these Plaintiffs' private properties. There is no evidence, on a tract-by-tract basis, to prove that traffic will substantially block the ingress or egress of Plaintiffs' properties.

2.      Shadow Effect.

Plaintiffs' architectural expert, Robert Grossman, showed that the building would cast a shadow during certain times of the year on all but six properties.[2] (4 RR 118-46; PX 4, 346).

---

[1]  6 RR 280-81; 7 RR 21-22, 50, 111, 202, 268-69.

[2]  Grossman admitted that the shadow would not touch the properties of Lin & Pu (1710 South Blvd.), Epps (1936 Wroxton Rd.), Martin (1811 Wroxton Rd.), Kimberly Bell (1729 Wroxton Rd.), Reusser/Couroucli

Grossman acknowledged that the amount and duration of the shadow to be cast by the Project would vary depending on the time of year and the location of each property in relation to the building. (*Id.*) Grossman provided calculations to show percentage of sunlight hours in full or partial shadow for only four properties, but none of the others. (4 RR 131-37).[3] The property with the greatest shadow effect – 1810 Bissonnet – lost the jury verdict. The Plaintiffs' horticulturist, Linda Gay, testified that the reduced sunlight would adversely affect certain species of the decorative plants growing in some of the Plaintiffs' yards. (8 RR 122-63).

3.    Invasion of Privacy.

The Plaintiffs fear that occupants of the Project will use vantage-points on the building or parking garage to look into the surrounding backyards and windows of the Plaintiffs' properties. There is no evidence to demonstrate, on a property-by-property basis, which of the Plaintiffs' window exteriors and backyards will be visible to occupants of the tower, or the distances involved; and no evidence exists to show which parts of the backyards or window exteriors were not already visible to occupants of the now-demolished Maryland Manor Apartments, or to passers-by generally.

4.    Foundation Damage.

The building will be founded on an auger cast pile foundation, consisting of approximately 600 piles. (6 RR 27-39). The piles are installed by a drilling and pouring method, not by hammering. (*Id*., at 30, 35-39).

---

(1801 Wroxton Rd.) and Baraniuk (1731 Wroxton Rd.) (5 RR 76-79).

[3]  These are Clark (1810 Bissonnet), Bell (1530 South Hampton Estates), Nguyen (1801 Bissonnet), and Loughhead (1736 Wroxton Ct.). *Id*.

Shortly before trial, 1717 proposed to drill the piles to a depth of 80 to 100 feet. (6 RR 31-32). Testimony from the parties' geotechnical engineers was hotly contested. The Plaintiffs' expert, Roderick Ellman, opined that the soils underlying the building site were a highly plastic clay that would settle approximately four inches under the weight of the building. (6 RR 41-73, 135-36). Mr. Ellman acknowledged that the precise extent of the damage that will occur cannot be predicted. (6 RR 72-73, 106-108). 1717's expert, Woodward Vogt, testified that the soils in that area of Houston were far stronger and that settlement would be negligible. (10 RR 35-64).

During trial, a deep boring of the soil on the Project site was conducted. The experts analyzed the data and again came to differing conclusions about the plasticity of the clays at 83 to 105 feet and at 103 to 105 feet. (15 RR 6-16; DX 142, 143, 157-58). Consistent with the soil configurations of the Houston area, the boring revealed a permanent sand layer existing approximately 110 feet below the surface. (10 RR 56-57, 64; 17 RR 113, 122-23; DX 142).

Following the trial of the case, 1717 modified its foundation design to lengthen 71 of the auger-cast piles underneath the two main shear wall boxes at the southwest and southeast corners of the garage, so that their tips extend at least two feet into the sand. (17 RR 74-76). At the balancing of the equities hearing, it was uncontroverted that this enhancement of the foundation design of the building will completely eliminate the threat of settlement of the underlying soils and the risk of foundation damage to the surrounding properties, even if, *arguendo*, Mr. Ellman's assumptions about the plasticity of the overlying clay soils are assumed true. (17 RR 120-24).

5.      Excessive Garage Lighting.

There is no pleading to support a claim that the Project will be a nuisance because of annoyances from lighting in the parking garage.  *See* 7th Amd. Pet. (CR 417-33).  At the outset of trial, 1717 objected to the admissibility of evidence relating to lighting on the ground of no pleadings (2 RR 59-53; 5 RR 8-9; 1 Supp. CR 3, 7, at Item #19), and later objected to the jury charge on the same ground.  (14 RR 30-31; Proposed Jury Instr. #7, CR 709).

In the Settlement Agreement between 1717 and the City of Houston, 1717 agreed to "ensure" that "the now existing adjacent residences are reasonably and practically screened from the direct impact of garage lighting and vehicle headlights inside the garage."  Settlement Agr., at ¶ II.4.h (DX 9).  The Agreement further provides that "all exterior lighting fixtures, including any and all lighting fixtures on any amenity floor, must be hooded or directed away from the now existing adjacent residences, so that the light source is not visible from those residences." *Id*.  The Settlement Agreement has been memorialized in a Declaration of Restrictive Covenants recorded against the Project site. *Id*.  1717's lighting designer, John F. Bos, was hired to review the Settlement Agreement with the City of Houston and design the lighting in accordance with that agreement.  (2 RR 140-43).  No evidence exists to prove that the City would not enforce this provision of the Settlement Agreement were 1717 later to breach it.

The exterior walls of the garage are designed at a sufficient height (42 inches) to block car headlamps (typically less than 36 inches) and also to intercept most light spill.  (12 RR 146-47).  The interior light fixtures will be louvered to prevent the visibility of the light source from

13

the surrounding properties. (12 RR 147-52). If viewed from a distance of 32 feet, ambient light from the garage will be comparable to a common street lamp. (12 RR 163).

Over objection that he had not been designated to testify as a lighting expert (4 RR 221-22), Mr. Grossman testified on the prospective garage lighting. Grossman's opinions were based on the assumption that 1717 will breach the Settlement Agreement. He assumed that the lighted bulbs hanging from the light fixtures in the garage would be visible to the surrounding properties because certain ceilings in the garage were higher than others. (4 RR 222-27). This testimony was rebutted by Mr. Bos, who showed that the lights were mounted on chains that can be easily adjusted to prevent the light sources from being seen from the ground. (4 RR 227).

Grossman opined that spill lighting from the proposed Project garage would be five times brighter than spill lighting from a single-family home (5-foot candles *vs.* 1-foot candle), a magnitude of intensity that he believes would annoy residents on the south side of the Project. (5 RR 214-15). Grossman did not explain how he arrived at these numbers. Mr. Bos testified that light intensity dissipates with distance. (12 RR 163). Accordingly, even if Grossman's opinion that spill light from the Project would measure 5-foot candles, such light would dissipate to less than one foot candle within 30 feet. *Id*. Mr. Grossman testified that movie-house step lights produce 1-2 foot candles. (5 RR 1214-15).

6.      Construction Activities.

1717 objected to the admission of evidence concerning future construction activities on the ground that no pleadings supported it. (2 RR 49-53; 5 RR 8-9; 1 Supp. CR 6-7). The Court overruled that objection. (2 RR 53; 5 RR 8). Nevertheless, the Plaintiffs proffered no expert

testimony about any annoyances that could be expected from the construction of the Project. Various of the Plaintiffs testified about their fears of construction noises, dust, and the like; but none of them demonstrated any competency to offer such testimony.

7.      Diminution of Market Value.

The Plaintiffs' real estate appraiser, Jeff Spilker, opined that even though the Project had not yet been built, the market was already reacting by devaluing the Plaintiffs' properties by approximately 12%, and in some cases up to 19% of their market value. (PX 6). To reach this conclusion, Spilker

(1)     postulated an area of devaluation surrounding the Project,

(2)     determined the average price per square-foot of properties outside of the impaired area that he opined to be similarly situated,

(3)     used the market values of properties outside of the affected area to project a *non-impaired* market value for each of the Plaintiffs' properties,

(4)     determined the value of allegedly comparable properties inside of the impaired area,

(5)     used the *impaired-area* comparables to project an *impaired* market value of the Plaintiffs' properties, and

(6)     found market diminution damages by subtracting non-impaired values (Step 3) from impaired values (Step 5) for each property.

(8 RR 195-220; 9 RR 23-53; PX 263-94).

15

The jury found that as to the twenty prevailing properties, the alleged prospective nuisance caused damages in the cumulative amount of $1,661,990.62. Within this total are separate findings for market value losses (total, $1,223,762.15) and loss of use and enjoyment (total, $438,228.47). (CR 736-38). The district court granted 1717's motion to disregard the damages for loss of use and enjoyment, but entered judgment on the market value damages. (CR 1215-16, 1272-73).

The jury's findings of lost market values were significantly less than the losses proposed by Spilker. It is apparent that the jury accepted the *non-impaired* values for each property as proposed by Spilker (Step 3). *See* PX 263-92. However, rather than accept Step 5 in Spilker's analysis, the jury appears to have determined damages on the basis of feared nuisance impacts discussed by the witnesses. Generally, and with a few anomalies, the jury found a 15% loss of value for properties within the zone projected by Mr. Ellman (geotechnical expert) for "extreme" foundation damage, 12% loss in Ellman's zone of "moderate" damage, 5% for properties on the west side of the Project (1801 Bissonnet and 1804 Wroxton Road), and all other Prevailing Plaintiffs received 3% awards.

Defendants' Exhibit 167 diagrams the percentage of market loss found by the jury for each of the Plaintiffs' properties. (Appendix 5)

As discussed below, no evidence was adduced to show that the assumed loss of market value had any causal connection with any of the testimony relating to the potential impacts from the building. The assumption of such a causal connection exists was simply assumed, not proven.

### E.    Pertinent Procedural Background.

At the close of the Plaintiffs' case-in-chief, 1717 moved for a directed verdict. That motion was granted in part, dismissing claims of all non-abutting Plaintiffs to the extent those claims depended on a finding of potential foundation damage. (9 RR 137-63; CR 694-701). At the close of the evidence, 1717 renewed its motion for directed verdict (CR 10-21; 15 RR 83-84), which was denied. (15 RR 83-84). The district court overruled 1717's objections to the jury charge, including no evidence objections to all liability and damage questions. *See* Defendant's Charge Objections (14 RR 14-30) (Appendix 6); (15 RR 83; CR 703-09, 723-28). Following the jury's verdict, 1717 moved for JNOV, which was denied in pertinent part. (CR741-81; 1153-76, Motion for JNOV); (CR 1199-1217, Memorandum Order). Over 1717's objection, the district court awarded taxable costs in favor of the Prevailing Plaintiffs. (CR 1271-75, Judgment).

## V.    SUMMARY OF THE ARGUMENT.

As with other torts, nuisance liability requires three basic elements: culpability, actionable injury, and damages that proximately result from the injury. None of these elements were proved in this case.

First, the liability finding of a potential nuisance that will exist only if the Project is built, does not constitute a tort that can support an award of damages. Loss of market value, whatever its cause, is immaterial in this case. Diminution of market value alone, buttressed by no accompanying personal injury or physical property damage, does not constitute an unreasonable

17

interference with the "use and enjoyment" of the land. It is *damnum absque injuria* – a loss without an injury in the legal sense.

Second, the culpability theory on which this case was tried – nuisance without fault – is inapplicable as a matter of law. The gravamen of the Plaintiffs' invocation of strict liability – that 1717's proposed high-rise apartment building is "too big" in relation to the surrounding single-family residences they allegedly own – befits the kind of controversy that would be properly aired in a zoning board of adjustment hearing. Only Houston has no zoning.

In Texas, strict nuisance liability is based upon the principle of *Rylands v. Fletcher.* The plaintiff must prove that the nuisance is *both* abnormal for its surroundings *and* inherently dangerous in its unusualness. No evidence exists to prove that the Project is ultra-hazardous or abnormally dangerous, under the *Rylands* doctrine. Buildings of the same general dimensions are common in Houston's inner city environment and pose no inherent dangers to nearby residents.

Third, no evidence exists to prove that the loss of market value of the Prevailing Plaintiffs' properties was proximately caused by the prospective nuisance found by the jury, and not by some other cause. Several other, non-actionable causes are possible – for example, the new apartment building will increase the supply of residential housing to the area; and the neighborhood residents themselves may have undermined their property values with negative publicity in the form of yard signs depicting the building as a toothed monster and referring to it as the "Tower of Traffic." Increased traffic, shadow, and architectural non-conformity with

the surrounding neighborhood (all code words for aesthetic complaints) are not actionable injuries.

In any event, even if the damage awards could survive the foregoing arguments that apply to all of the Plaintiffs' claims, additional, subsidiary arguments defeat the claims of two distinct subsets of the Plaintiffs.

First, as to all of the Plaintiffs who are outside of the zone of potential foundation damage – identified below as the non-abutting Plaintiffs – there is no evidence that the Project, if built, will substantially interfere with the use and enjoyment of their properties. The shadow cast by the proposed apartment building cannot constitute a nuisance under Texas law, and certainly not on these facts. Plaintiffs lack standing to complain of increased traffic on city streets. The liability question only asked about a prospective nuisance on "their land" – a private nuisance, not a public nuisance. And no pleadings or evidence supports any finding that any light or construction-related annoyance will rise to the level of substantial interference with the use and enjoyment of these non-abutting properties.

Second, two of the Prevailing Plaintiffs did not prove any justiciable ownership of the abutting properties.

Finally, because the judgment in favor of all of the Prevailing Plaintiffs should be reversed and rendered for 1717, an award of taxable costs should be rendered for 1717 as well.

# VI. ARGUMENT.

## A. Standard of Review.

A denial of a motion for JNOV is reviewed de novo on appeal. *Internacional Realty, Inc. v. 2005 RP West, Ltd.*, 449 S.W.3d 512, 530 (Tex. App.—Houston [1st Dist.] 2014, no pet.). A trial court may grant a motion for JNOV if the evidence is legally insufficient to support the jury's findings on the material fact issues. *Rocor Int'l, Inc. v. Nat'l Union Fire Ins. Co.*, 77 S.W.3d 253, 268 (Tex. 2002). A legal-sufficiency point must be sustained when (1) there is a complete absence of evidence of a vital fact; (2) rules of law or evidence preclude the factfinder from giving any weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *City of Keller v. Wilson,* 168 S.W.3d 802, 810 (Tex. 2005).

A trial court may disregard a jury finding when it is unsupported by evidence or when the issue is legally immaterial. *Southeastern Pipe Line Co. v. Tichachek*, 997 S.W.2d 166, 172 (Tex. 1999); *Spencer v. Eagle Star Insurance Co.*, 876 S.W.2d 154, 157 (Tex. 1994)(citing *C. & R. Transport, Inc. v. Campbell*, 406 S.W.2d 191, 194 (Tex. 1966)). A question is immaterial when it should not have been submitted, or when it was properly submitted but has been rendered immaterial by other findings. *Id.* A question which calls for a finding beyond the province of the jury, such as a question of law, also may be deemed immaterial. *Spencer*, 876 S.W.2d at 157 (citing 4 R. McDonald, TEXAS CIVIL PRACTICE IN DISTRICT & COUNTY COURTS §17.31 (1984 & Supp. 1988)).

**B.     No Tort Finding Supports the Damage Award.**

"[N]uisance claims arise only upon a substantial interference with property use." *Schneider Nat. Carriers, Inc. v. Bates*, 147 S.W.3d 264, 279 (Tex. 2004) (internal quotations deleted).  By disregarding the jury findings of use and enjoyment damages, the district court acknowledged, in effect, that no nuisance claim had arisen because the unbuilt Project has not yet interfered with the use and enjoyment of any of the Plaintiffs' properties.  Such interference, the court noted, "is speculative until the project is constructed."  (CR 1216).  Yet the court awarded lost market value damages because the market has already responded to the likelihood that a tower will be built.  *Id.*

This reasoning is erroneous.  An anticipatory nuisance causes no interference with use and enjoyment of property.  Thus, it is not a tort that can support a damage recovery.   In circular fashion, the district court reasoned that the lost market value is the condition that supports the recovery of that loss.  However, merely causing diminution of the value of property is not a tort either.

The Second Restatement of Torts distinguishes suits in equity to enjoin prospective invasions of property interests from suits at law for damages caused by an existing nuisance.  Although a court may enjoin certain threatened nuisances before they occur, the right to recover damages does not ripen until an actual nuisance inflicts a cognizable injury.  *See* RESTATEMENT (2d) OF TORTS § 822 (private nuisance), comment d ("An injunction may be obtained in a proper case against a threatened private nuisance, *but an action cannot be maintained at law unless harm already has been suffered*.") (emphasis added); *id*., at § 821B (public nuisance), comment

21

i ("an award of damages is retroactive, applying to past conduct, while an injunction applies only to the future. In addition, *for damages to be awarded significant harm must have been actually incurred*, while for an injunction harm need only be threatened and need not actually have been sustained at all.") (emphasis added).[4]

Texas cases exemplify this Restatement position. "A cause of action for damaging land does not lie for anticipated future damages that have not yet occurred." *Allen v. City of Tex. City*, 775 S.W.2d 863, 866 (Tex. App.—Houston [1st Dist.] 1989, writ denied); *see also Corley v. Exxon Pipeline Co.*, 821 S.W.2d 435, 437 (Tex. App.—Houston [14th Dist.] 1991, writ denied) ("A cause of action for damaging land does not lie for anticipated damages, rather it accrues at the time the land is actually damaged."); *Sanders v. Miller*, 52 Tex. Civ. App. 372, 113 S.W. 996 (Texarkana — 1908, no writ) (reversing lost market value damage award and rendering judgment for defendant where, as here, the nuisance had not yet occurred and "the entire claim for damage is predicated upon a condition which it is expected will arise sometime in the future").

In *Sanders v. Miller*, the defendant constructed a backyard swimming pool. During the early twentieth century, swimming pools often became breeding tanks for mosquitos. At the time of trial, the recently constructed pool was not yet the malarial swamp it was alleged to

---

[4]  *See also Helix Land Co. v. City of San Diego*, 82 Cal. App. 3d 932, 147 Cal. Rptr. 683, 693 (1978) (landowners were not entitled to recover for a future threat of flooding to their property where the city and state had adopted a flood control plan, because the risk of future flooding is not an act and does not give rise to a cause of action for damages in nuisance: "Helix may not recover damages for potential, future injuries arising from the threat of nuisance."); *Rutter v. Carroll's Foods of the Midwest, Inc.*, 50 F. Supp. 2d 876, 886 (N.D. Iowa 1999) (applying Iowa law and stating that "[d]amages are only available if the 'anticipated' trespass or nuisance ripens into an actual nuisance.").

become.  Nevertheless, the plaintiff, who resided nearby, sued for the loss of market value of his property which had resulted from the presence of the still prospective nuisance.  As the court described the situation:

> Both the pleadings and the evidence in this case show that the damage claimed to Miller's premises is due to the fact that in the future they will be unfit, or undesirable, for occupancy as a place of residence, by reason of the surrounding sanitary conditions being rendered unwholesome; that these unsanitary conditions have not yet occurred, but are practically certain to occur in the ordinary course of events.  At the time of filing the suit and of the trial of the case no injurious results had actually been produced by the proximity of the pool, and it does not appear that there was any immediate danger of any at an early date. The entire claim for damage is predicated upon a condition which it is expected will arise sometime in the future.

113 S.W. at 999.  The plaintiff's damages, "being dependent on the creation of the unwholesome conditions exclusively, [could] not be said to have any legal existence until the offensive conditions appear." *Sanders*, 113 S.W. at 999.  The court thus concluded:

> The evidence in this case failing to show that [plaintiff] Miller had suffered any discomfort or inconvenience or annoyance by reason of the presence of the pool, we do not think there was any basis for damages.

*Id*.

More recent Texas cases have applied the same principle to the analogous context of a claim for lost market value where the defendant threatens to withdraw subjacent or lateral support from the plaintiff's land.  For example, in *Braxton v. Chin Tuo Chen*, No. 06-10-00134-CV, 2011 Tex. App. LEXIS 7414, at * 16, 2011 WL 4031171 (Tex. App.—Texarkana Sept. 13, 2011, pet. denied) (mem op.), the court held that "the threat of the loss of lateral support is not sufficient injury to support a claim for loss of lateral support," even where the plaintiff

succeeded in demonstrating that the mere threat of injury to the land had already reduced the property's market value. *See also* RESTATEMENT (Second) OF TORTS §§ 817 and 821 cmts. i (1979) ("the withdrawal of the naturally necessary . . . support subjects the actor to liability but does not make him liable in an action for damages *unless, and until, a subsidence occurs*.") (emphasis added).

In the present case, the alleged nuisance is, by its nature, prospective or anticipatory – the still un-built Project has no current light, privacy, shadow, foundation, or traffic impact as the Plaintiffs claim it will have, and thus, it is not, literally speaking, a nuisance *in fact* at all. *Sanders*, 113 S.W. at 999 ("There was no stagnant water in the pool, no insect pests had been produced, and no legal rights which Miller possessed to the use of his premises had been interfered with. *Therefore it could not be said that the pool was at the time of the trial a nuisance in fact*.") (emphasis added).

While it is true that loss of market value is the proper measure of damage for a permanent nuisance, losing market value of one's property does not interfere with its use and enjoyment. As our Supreme Court has noted, "[e]very change in property value does not indicate a permanent nuisance. Property values are affected by many factors; *a decrease in market value does not mean there is a nuisance*, any more than an increase means there is not." *Schneider*, 147 S.W.3d at 277 (emphasis added; footnotes omitted). Mere diminution in property value is *damnum absque injuria* -- a loss without an injury in the legal sense. *See, e.g., Sanders*, 113 S.W. at 996-1000; *Maranatha Temple, Inc. v. Enterprise Products Co.*, 893 S.W.2d 92, 99-100 (Tex. App.—Houston [1st Dist.] 1994, writ denied) (market value disallowed where no injury

24

to "land or body" had been established); *Houston Gas & Fuel Co. v. Harlow*, 297 S.W. 570, 572 (Tex. Civ. App.—Houston 1927, no writ) ("If there be no nuisance, there can be no recovery of damages for such annoyance as may exist, nor for diminution in the value of the property."); *Dallas Land & Loan Co. v. Garrett*, 276 S.W. 471, 474 (Tex. Civ. App.—Dallas 1925, no writ) (garage built for residents of an apartment complex was not a nuisance because "[m]atters that annoy by being disagreeable, unsightly, and undesirable are not nuisances simply because they may to some extent affect the value of property"); *Thurow v. City of Dallas*, 499 S.W.2d 347, 348 (Tex. Civ. App.—Dallas 1973, writ ref'd n.r.e.) ("The general rule is that announcement of a projected public improvement, together with preparation of plans and maps showing the property in question as within the limits of the project, without any actual interference with the owner's use, does not constitute a taking or compensable damaging, *even though it may reduce marketability as a practical matter*.") (emphasis added).

As diminished market value is not by itself a sufficient basis for the imposition of liability, the finding of such loss cannot supply the essential elements of liability. Thus, the district court erred in denying 1717's motion to disregard the Plaintiffs' loss of market value damages. (CR 710-12, 776-78, 1216).

### C. The Plaintiffs Waived Damages by Failing to Request the District Court to Submit a Claim for Which Damages Are Recoverable.

Over a materiality objection, (14 RR 7-8), the Plaintiffs did not request the district court to submit a jury question that could support any award of damages. *See Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 44 (Tex. 2007) (stating that if the plaintiff refuses to submit a viable theory of liability over the defendant's objection, so that no jury question is submitted on a

25

controlling issue, the case may be reversed and judgment rendered); *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992)). A damage recovery was therefore waived.

**D.    No Evidence Exists to Prove That Plaintiffs' Damages Were Proximately Caused by Any Actionable Nuisance.**

To recover market value damages in a nuisance case, the plaintiff must prove not only the amount of damages, but must also prove that the damages were proximately caused by the alleged nuisance and not by some other cause. *See Houston Unlimited, Inc. v. Mel Acres Ranch*, 443 S.W.3d 820 (Tex. 2014). In the present case, the Prevailing Plaintiffs failed to prove this requisite causal link between any prospective nuisance and the claimed diminution of the market value of their properties. The district court therefore erred in denying 1717's motion for JNOV on this ground. (CR 778-79, 1216).

In *Houston Unlimited*, the Supreme Court addressed the legal sufficiency of expert appraisal testimony offered to prove "stigma" damages. Although the plaintiff's property, Mel Acres Ranch, had been physically damaged by the defendant's hazardous waste spill, the physical injury to the land had been fully remediated by the time of trial. In terms of physical damage, therefore, the spill was in the nature of a temporary nuisance, for which loss of market value damages are ordinarily inappropriate. Mel Acres nevertheless sought market value damages, ordinarily recoverable only in permanent nuisance cases, because the "stigma" of poisonous waste on its ranch land, remediated or not, would permanently undermine the value of the property among potential buyers, where "perception is everything." 443 S.W.3d at 824.

Without deciding whether stigma damages can ever be recovered in Texas,[5] the Supreme Court began its analysis recognizing that "[e]ven when it is legally possible to recover stigma damages, it is often legally impossible to prove them." *Houston Unlimited*, 443 S.W.3d at 827. One of the "fatal flaws" in the proof that the Court identified was the plaintiff's failure to show that decline of market value did in fact result from the remediated nuisance. The plaintiff's appraiser "merely assumed that the diminution in market value she found was (wholly) attributable to the nearby contamination." *Id*. at 830. The appraiser did not attempt to rule out other plausible causes. *Id*. at 833. As the Court reasoned:

> While the parties agreed that environmental contamination can result in a diminution in property value that remains even after the contamination is remediated, the parties did not agree, and there was no evidence indicating, that this is always the case. Absent such evidence, we cannot assume, without evidence, that any (much less all) of the diminution [plaintiff's appraiser] found for the [comparator] sites was attributable to market stigma. And even if there were such evidence or evidence that contaminated properties always retain some diminution in market value even after remediation, Mel Acres offered no evidence tending to show that all of the [comparator] sites' alleged diminutions in value were attributable to stigma or to apportion such diminution among stigma and other possible causes.

*Id*. at 833-34.

---

[5] Before addressing the sufficiency of the plaintiff's proof of damages, the Court declined to decide whether stigma damages could ever be recovered in Texas. A claim in this case for stigma damages is on even weaker grounds than the claim in *Houston Unlimited*, because here there is no physical injury (a toxic spill) that can be said to be causing the present loss of market value. *Houston Unlimited*, 443 S.W.3d at 827 ("most jurisdictions agree that plaintiffs must experience some physical injury to their property before they may recover stigma damages[; however,] jurisdictions are divided on whether the injury must be temporary or permanent."). As discussed in the previous section, the damages here are alleged to have been caused by the prospect of a future nuisance, which is *damnum absque injuria* – a loss without any legal injury.

The damage findings in the present case are similarly flawed. The Plaintiffs' appraiser, Mr. Spilker, made no attempt to prove that buyers in the relevant market would pay less for the plaintiff properties because of any specific feature of the Project that the jury found to be a prospective nuisance. Indeed, there was nothing but anecdotal evidence – the yard sign propaganda campaign depicting the "Tower of Traffic" as a looming monster menacing the neighborhood – to suggest that prospective buyers even knew about any of the specific design features of the Project that the Plaintiffs challenged at trial.

Like the plaintiff's appraisal expert in *Houston Unlimited*, Mr. Spilker made no attempt to prove that the loss of market value was not due to some other cause. Spilker did not account for, and rule out, alternative explanations for why the market value of Plaintiffs' properties might have declined, such as the market's reaction to the anticipated aesthetics of the building (a non-actionable impact), or fear of traffic congestion (an alleged public nuisance, for which Plaintiffs lack standing to sue). Mr. Spilker did not attempt to separate out devaluation potentially caused by inflammatory propaganda campaign. There was no evidence to prove what prospective buyers knew about the Project or believed about it, and more importantly, whether and to what extent any such beliefs are based upon facts, exaggeration, or pure fiction.

Moreover, Mr. Spilker did not take into account the fact that the 1717 tract is not deed restricted and is surrounded by commercial and multifamily developments (albeit of smaller dimensions). (13 RR 29-38). Mr. Spilker did not even factor into his damage model the law of supply and demand – that the Project, when built, could lower home prices in the neighborhood simply by increasing the supply of high-end residential housing. In short, the

28

jury's finding that the market value damages have been caused by "the nuisance, if built" is based entirely on legally insufficient evidence and speculation.

Tellingly, the jury attempted to fill the gaps left in Mr. Spilker's analysis by speculating about the damages that might be caused by the alleged future impacts of the Project. For example, properties predicted to sustain "severe" foundation damage were found by the jury to have lost 15% of their market value; properties predicted to sustain "moderate" foundation damage to have lost 12% of their value; and properties outside of the zone of foundation damage were found by the jury to have sustained market value losses of 3% to 5%, based upon unknown factors. (*See* DX 167). Although there is not a shred of evidence to link market value loss to these alleged future impacts, the lay jury cannot be faulted for attempting to postulate the critical link that is glaringly absent in the proof.

Accordingly, even if Texas were to become the first state in the Union to allow recovery of market value damages for a contingent occurrence, the Plaintiffs in this case offered no evidence to prove that the loss of market value of each of their properties was the proximate result of a nuisance condition, as distinguished from some other non-actionable cause in fact.

**E.     No Evidence Supports the Applicability of Strict Liability.**

1.     Introduction.

The findings of liability in this case were not premised upon any theory of negligence or intentional injury. Rather, Plaintiffs pled and submitted their case upon a novel theory of strict liability – that the proposed 21-story apartment building, situated in this mixed-use, inner-city neighborhood, will be abnormal and out of place in relation to the size of the residences on the

29

Plaintiffs' nearby properties. *See* 7ᵗʰ Amd. Pet., at ¶ 8 (CR 420) (alleging that the project, if built, will be "vastly oversized, and incongruous with the surrounding community, and "[a]t 21 stories tall would dwarf every structure in the surrounding area and would dramatically alter the character of the neighborhood").[6] The constant refrain in the testimony was that the Project will be big.[7] As the district judge summed up the gravamen of the Plaintiffs' case:

> In the end, this project is a residential development in a residential neighborhood. Plaintiffs' opposition is primarily scale – plaintiffs argue the project is simply too big.

(CR 209).

A nuisance that is culpable for being 'out of place in the surroundings' is "essentially a form of strict-liability nuisance." *Hanson Aggregates W., Inc. v. Ford*, 338 S.W.3d 39, 46 (Tex. App.—Austin 2011, pet. dism'd). Whether strict liability applies in a nuisance case raises a question of law in light of all of the evidence. *See* RESTATEMENT (2d) OF TORTS § 520, comment l (ALI 1979), stating:

> The imposition of strict liability . . . involves a characterization of the defendant's activity or enterprise itself, and a decision as to whether he is free to conduct it at all without becoming subject to liability for the harm that ensues even though he has used all reasonable care. This calls for a decision of the court; and it is no part of the province of the jury to decide whether an industrial enterprise upon which the community's prosperity might depend is located in the wrong place

---

[6] 1717 objected to the liability instruction on the ground that the phrase "abnormal or out of place," standing alone, is not a correct standard of law: "The concept should include the instruction that the condition is abnormal or out of place in the sense that it creates inherent unreasonable danger." 14 RR 27, *see also* Proposed Instr. # 3 (CR 705). Because 1717 objected to the charge, the evidence must be reviewed on appeal according to the standard that the trial court *should have applied*. *See St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 530 (Tex. 2003).

[7] 4 RR 73 (Loughhead, "It is a large building"); 6 RR 166 (Flatt, height and bulk are "ridiculously different," a "joke in the worse possible taste."); 8 RR 75 (Rund, "a monster building").

or whether such an activity as blasting is to be permitted without liability in the center of a large city.

*Id*.

In the present case, as discussed below, the liability finding for each of the Prevailing Plaintiffs is immaterial and should be disregarded because, as a matter of law, the doctrine of nuisance without fault is inapplicable on this record. Alternatively, no evidence exists to show that the Project, as it was proposed at the time of trial, will be abnormal and out of place in the manner required by law to trigger strict liability for creating a nuisance.

2.      *Tyler v. Likes*.

The concept that a nuisance "culpable because [it is] abnormal and out of place in its surroundings," is mentioned in *City of Tyler v. Likes*, 962 S.W.2d 489, 502 (Tex. 1997). "Abnormal" and "out of place" in this equation are ambiguous terms and must be understood within the doctrine of *Rylands v. Fletcher*, which most American jurisdictions, including Texas, cite approvingly as the paradigm for strict nuisance liability. *See* RESTATEMENT (Third) OF TORTS § 20, comment d (ALI 1998). "Non-natural use" in this context means use that is "*both* unusual *and distinctively dangerous in its unusualness*." *Id*. (emphasis added).

In *Likes,* the Supreme Court expressly referenced the "principle of *Rylands v. Fletcher*" as one of the three recognized theories of culpability in a nuisance case. On review in that case was a summary judgment for the defendant, City of Tyler, on the claims that the City's culvert system directed storm water onto the plaintiff's property. Allegedly, the nuisance was intentionally and negligently caused, but, as the Court noted, the plaintiff "did not plead that the

operation of the culvert system was a nuisance by virtue of being abnormal or out of place in its surroundings." *Likes*, 962 S.W.2d at 493 (emphasis added).

In *Likes*, the question of what constituted a nuisance "culpable for being abnormal and out of place" was not before the Court. However, the Court addressed the concept of strict nuisance liability in the context of affirming the summary judgment against the plaintiff's "non-negligent" nuisance claims:

> Courts have broken actionable nuisance into three classifications: negligent invasion of another's interests; intentional invasion of another's interests; **or other conduct**, **culpable because abnormal and out of place in its surroundings**, that invades another's interests. *See Bible Baptist Church v. City of Cleburne*, 848 S.W.2d 826, 829 (Tex. App.—Waco 1993, writ denied) (setting up categories for actionable nuisance); *see also Gotcher v. City of Farmersville*, 137 Tex. 12, 151 S.W.2d 565, 566 (Tex. 1941) (*dicta* stating that a municipality is liable for the maintenance of a nuisance in the course of the performance of a governmental function if the nuisance is an unlawful invasion of another's interests); *City of Texarkana* [*v. Taylor*], 490 S.W.2d [191,] 194 [(Tex. Civ. App.--Texarkana 1972, writ ref'd n.r.e.)] (holding municipality not liable for nuisance caused by the negligent performance of a governmental function); Prosser, *Nuisance Without Fault*, 20 TEX. L. REV. 399, 416-17 (1942). As Dean Prosser explained:
>
>> Nuisance, whether it be public or private, is thus a field of tort liability, a kind of damage done, rather than any particular type of conduct. As in the case of any other kind of damage, it may be inflicted by conduct which is intended to cause harm, by that which is merely negligent, **or by that which involves an unusual hazard or risk, in line with the principle of *Rylands v. Fletcher***.

*Likes*, 962 S.W.2d at 503-04 (emphasis added).

32

In short, *Likes* teaches that nuisance has the same three-part structure as other torts: (1) culpability, (2) invasion of rights, and (3) resulting damages:

> The type of invasion that characterizes "nuisance" is not, in itself, a legal wrong that gives rise to a right to relief. Similar to many other types of invasions or infringements, the invasion characterizing "nuisance" becomes tortious and wrongful only when caused by intentional or negligent conduct, or conduct that is abnormal and out of place in its surroundings (essentially a form of strict-liability nuisance).

*Hanson Aggregates West, Inc. v. Ford*, 338 S.W.3d 39, 45-46 (Tex. App.—Austin 2011, pet denied) (citing *Likes*, Prosser's *Nuisance Without Fault*, and *Rylands v. Fletcher*).

It is instructive to note that none of the cases cited by *Likes* involved claims of strict nuisance liability. More to the point, *Likes* did not approve the imposition of strict liability for incongruous of high vs. low density uses, or low-rise vs. high-rise residences. *Bible Baptist Church* and *City of Texarkana* each involved a negligent sewage spill – not strict liability; and *Gotcher* rejected an attractive nuisance claim, where it was alleged that a child had drowned in a cesspool. The only authority cited in *Likes* that elaborates on strict liability for non-natural uses of land, is Prosser's seminal article, *Nuisance Without Fault*.

As Prosser understood it, the form of strict nuisance liability that American courts associate with *Rylands* is one that applies "only to the thing out of place, **the abnormally dangerous condition or activity** which is not a 'natural' one where it is." W. Page Keeton, Prosser & Keeton on the Law of Torts, § 78, at p. 550 (5th Ed. 1984) (emphasis added). Non-natural use in this sense is not simply architectural non-conformity. In *Nuisance Without Fault*, Prosser stated:

> *Rylands v. Fletcher* was a case of adjoining landowners, but it was soon recognized that there was no reason to limit the rule to activities on the defendant's own land. It has been applied to water, gas or electric conduits under the public highway and to dangerous vehicles driven along it. **The doctrine, as it has developed, has become one of "dangerous" things and activities, involving a high degree of risk to those in the vicinity even if all possible care is used. They have been called "ultrahazardous," or "inherently dangerous." The basis of liability is an undue risk, in spite of all reasonable precautions**.

Prosser, *Nuisance Without Fault*, 20 TEX. L. REV. at 403 (internal quotations, footnotes and ellipses deleted; boldfacing added).

Accordingly, where *Likes* discusses strict-liability for non-natural conditions, that discussion – which embraces the body of jurisprudence imposing strict liability for dangerous things and activities – must be understood as limiting strict liability to conduct that is inherently dangerous for that location. *See, e.g., Parson v. Texas City*, 259 S.W.2d 333, 336 (Tex. Civ. App.—Fort Worth 1953, writ ref'd) (and cases cited) ("the weight of authority in this state and other jurisdictions is to the effect that to constitute a nuisance the danger must be inherent in the thing itself, beyond that arising from negligence in its use.").

3.  *Rylands* and the Restatement:  Strict Nuisance Liability in Texas for Ultrahazardous and Inherently Dangerous Conditions.

Although the American Law Institute does not expressly state that the Restatement's articulation of liability for engaging in ultrahazardous or abnormally dangerous activities is an attempt to codify *Rylands*, most courts agree that this has been the intent of the authors.[8]  There

---

[8] *See, e.g., Valentine v. Pioneer Chlor Alkali Co.*, 864 P.2d 295, 297 (Nev. 1993) ("The doctrine of Rylands has been explained and codified in the Restatement (Second) of Torts, section 519 (1977)."); *N. Little Rock Transp. Co. v. Finkbeiner*, 243 Ark. 596, 608 (Ark. 1967) ("These sections [Speaking of the 1939 Restatement of Torts §§ 519, 520] are nothing more than a codification of the principle of *Rylands v.*

are two Texas cases that have adopted the evolving Restatement position on strict nuisance liability, one from the Supreme Court and the other from this Court of Appeals.

In *City of Houston v. Renault, Inc.*, 431 S.W.2d 322, 325 (Tex. 1968), in its discussion of the requisite elements of fault to establish a claim for diverting or impounding surface water, the Supreme Court approved the liability standard articulated in Section 833 of the RESTATEMENT (First) OF TORTS (ALI 1939):

> According to the American Law Institute, the liability of one who causes an unintentional but substantial invasion of the land of another by interfering with the flow of surface water depends upon whether his conduct was negligent, reckless **or ultrahazardous**. Where the invasion is intentional, liability depends upon whether the invasion was unreasonable. An invasion is intentional within the meaning of these rules when the defendant acts for the purpose of causing it or knows that it is resulting or is substantially certain to result from his conduct. *See* Restatement, Torts, § 833 and comments thereunder. In our opinion this is the sound and better rule in the absence of a statute governing the rights and obligations of the parties . . . .

*Id.* (emphasis added).

Section 833 is not a stand-alone rule for surface water diversion cases, but rather, incorporates by reference the general nuisance principles embodied by Sections 822 through 831 of the First Restatement.[9] The Restatement categorizes surface water diversion as a specific form of nuisance. *See id.*, at comment a; see also RESTATEMENT (Second) OF TORTS § 833,

---

*Fletcher* . . . .”); *Albig v. Mun. Auth.y of Westmoreland County*., 502 A.2d 658, 662 (Pa. Super. 1985) (“In 1938, however, the doctrine of *Rylands v. Fletcher* was incorporated into and articulated by the American Law Institute's Restatement of Torts.”); *Branch v. W. Petroleum, Inc.*, 657 P.2d 267, 273 (Utah 1982) (“That doctrine [Rylands v. Fletcher] was the genesis of § 519 of the Restatement of Torts . . . .”).

9  Section 833 reads: “Non-trespassory invasions of a person's interest in the use and enjoyment of land resulting from another's interference with the flow of surface water are governed by the rules stated in §§ 822-831.”  RESTATEMENT (First) OF TORTS § 833 (ALI 1939).

comment a (ALI 1971) ("Interference with the flow of surface water is one form of conduct that may result in a private nuisance."). *Renault*'s reference to "ultrahazardous" activities derives from Section 822 of the First Restatement, which, in turn, recognizes general nuisance liability where the invasion of property rights is "either (i) intentional and unreasonable; or (ii) unintentional and otherwise actionable under the rules governing liability for negligent, reckless **or ultrahazardous conduct**." RESTATEMENT (First) OF TORTS § 822(d) (ALI 1939) (emphasis added).[10] In Section 522, the First Restatement defines an activity as "ultrahazardous" "if it (a) necessarily involves a risk of serious harm to the person, land or chattels of others which cannot be eliminated by the exercise of the utmost care, and (b) is not a matter of common usage." *Id.*, at § 520.

Some two decades later, in *Bily v. Omni Equities, Inc.*, 731 S.W.2d 606, 611-12 (Tex. App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.), this Court addressed a claim for surface water diversion within the framework of the general nuisance liability standards of the *Second* Restatement of Torts, published post-*Renault*. *See Bily*, 731 S.W.2d at 611 ("The [supreme] court has adopted the reasoning of the American Law Institute as stated in the Restatement of Torts (Second) in describing this common law action.") (citing *Renault*). In accord with the Second Restatement, this Court in *Bily* stated:

> A private nuisance is a non-trespassory invasion of another's interest
> in the private use or enjoyment of land. [Restatement (Second) of

---

[10] The Second Restatement is similar: RESTATEMENT (2d) OF TORTS § 822 (1977) ("One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either (a) intentional and unreasonable, or (b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, **or for abnormally dangerous conditions or activities**.") (emphasis added).

Torts] at § 821D. The invasion can be intentional or unintentional. When the invasion is intentional, liability depends upon whether the invasion was unreasonable. *Id.* at § 822 and § 833 comment b. If the invasion is unintentional, liability depends upon whether the defendant's conduct was negligent, reckless, **or abnormally dangerous**. *Id.*

*Id.* at 611-612 (emphasis added).[11]

The most recent iteration of the ALI on the topic of strict nuisance appears in Section 20 of the Third Restatement of Torts.[12] Section 20 has not been adopted (or even yet discussed) by any Texas court; yet it is instructive in this case for two reasons. First, as discussed in the commentary, Section 20 is a modern adaptation of the *Rylands* principle, whereby "non-natural use" is understood to mean that the defendant's land use is both unusual and distinctively dangerous in its unusualness. *Id.*, at comment d. Second, Section 20 of the Third Restatement is intended to work in tandem with claims for strict liability nuisance under Sections 821 and 822 of the Second Restatement of Torts, which this Court cited approvingly in *Bily*. *See id.*, at comment c.

---

[11] In defining the culpability element for strict liability, the Second Restatement's "abnormally dangerous" definition slightly alters the First Restatement's "ultrahazardous activity" test. Section 520 of the Restatement (Second) of Torts sets forth six factors relevant to the court's determination of whether an activity is abnormally dangerous: (a) existence of a high degree of risk of some harm to the person, land or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes. *Id.*

[12] *See* RESTATEMENT (3d) OF TORTS § 20(a) (ALI 1997), provides that "[a]n actor who carries on an abnormally dangerous activity is subject to strict liability for physical harm resulting from the activity." Section 20(b) defines an activity as "abnormally dangerous if: (1) the activity creates a foreseeable and highly significant risk of physical harm even when reasonable care is exercised by all actors; and (2) the activity is not one of common usage." *Id.*

4. Strict Liability Does Not Apply to 1717's Proposed
Apartment Building.

No Texas case, and apparently none from any other jurisdiction, has applied nuisance without fault to a complaint of this sort – that a residential structure is "just too big" in comparison to neighboring residences. *See, e.g., California Tahoe Regional Planning Agency v. Jenkins*, 591 F.2d 181 (9th Cir. 1971) (rejecting the claim that high-rise casinos near Lake Tahoe created a nuisance by attracting more people and cars to the area, and reasoning that "not every threatened injury can be enjoined as a potential nuisance. The line is not a bright one, but we cannot consider high rise hotels and their occupants as indistinguishable from untreated sewage, noxious gasses, and poisonous pesticides."). As the district judge alluded to in his memorandum opinion, zoning laws can be passed to preserve the integrity of single-family residential districts. However, the voters of Houston have rejected zoning repeatedly (*see* 9 RR 177-78), and it is not the province of the judiciary to make nuisance liability strict merely upon the sort of showing that might be pertinent before a zoning board of adjustment – that 1717's proposed high rise residential use is "out of character" with the Plaintiffs' existing single family or duplex residential use.

In the present case, no evidence exists to prove that the Project as a whole, or that any specific design feature of the Project, will be "conduct abnormal and out of place" in the legally relevant sense – that the Project is both unusual and distinctively dangerous in its unusualness. *Likes, supra*, at 504 (citing Prosser's *Nuisance Without Fault*). Strictly speaking, the size of the proposed building is not "conduct" in any sense (*see, Likes, supra*, at 503), but rather an architectural feature of the Project. Furthermore, even if the strict liability standard in Texas

38

were based simply upon a discordant use – such as the proverbial pig in a parlor – there is no evidence that strict liability applies on these facts.  A *residential* highrise building in a *residential* neighborhood are all *residences* – living spaces for human beings, not pigs.

The Plaintiffs' claim that the highrise is too big for the neighborhood is nothing besides a thinly-veiled indictment of the building's aesthetics.  *See, e.g.*, Letter of Plaintiff Flatt (DX 93) (commenting that the Project is "so preposterously out of scale that the contrast would both diminish the beauty of the surrounding neighborhood and render ridiculous the pitiful window dressing applied to its facade").  Proportionality lies in the eyes of the beholder.  Curb appeal does not justify common law nuisance abatement.  *See Dallas Land & Loan Co. v. Garrett*, 276 S.W. 471, 474 (Tex. Civ. App.—Fort Worth 1917, no writ) ("Matters that annoy by being disagreeable, unsightly, and undesirable are not nuisances simply because they may to some extent affect the value of property.").

Moreover, as discussed below, impact-by-impact, the Plaintiffs' specific complaints about certain design features of this particular Project do not trigger strict liability:

*\* Traffic and Increased Density.*  In Section VI.G.2. of this Brief, 1717 will demonstrate that the Plaintiffs have no standing to complain about the increase of rush hour traffic on public streets they do not own.  In any event, nothing about the density of the Project – 228 apartment units and four townhomes on 1.6 acres of inner city land – is unusual and distinctively dangerous in its unusualness.  *See also cf.* PROSSER & KEETON ON TORTS, § 88B, p. 633 (5th ed 1984) ("The fact that the activity is of the general kind permitted is relevant as indicating something about the present and probable future character of the neighborhood.") (footnotes

omitted); RESTATEMENT (Third) OF TORTS § 20, comment j ("automobiles are in such general use that their operation is a matter of common usage. Accordingly, at least for this reason, the operation of automobiles is not an abnormally dangerous activity."). Thus, there is no evidence to support the imposition of strict liability on the theory that the Project, if built, will increase rush hour traffic in the neighborhood.

*\* Overlooking Vantage-Points*. As the district court correctly noted, a common feature of inner city life is that neighbors can see into one another's backyards. (CR 1213). Even before the 1717 highrise was contemplated, the backyards and exterior windows of several of the Plaintiffs' properties could be viewed from the two-story Maryland Manor Apartments. (*See* Photos from Maryland Manor Apartments (DX 2); 10 RR 201-13). Complaints that residents of the tower and their guests will be able to see window exteriors and backyards of some of the Plaintiffs' properties cannot support the imposition of strict liability. *See* RESTATEMENT (3d) OF TORTS § 20, comment j ("An activity that is normal or usual is not abnormally dangerous.").

In addition, the danger of being observed by peeping toms is not an inherent danger of the Project, any more than automobile accidents are an inherent danger of a street. The invasion of privacy must be committed by a third person, the prospective peeping tom. Strict liability is inappropriate where, as here, the intentional conduct of actors *other than the defendant* will determine whether any privacy invasion may later occur. RESTATEMENT (3d) OF TORTS, § 320, at comment h. Finally, in determining whether an activity is abnormally dangerous, it is also appropriate for the court to consider whether the harm is one the plaintiff can avoid by the exercise of due care. *Id*. ("an activity is not inherently and unavoidably dangerous if reasonable

40

precautions by potential victims can commonly succeed in avoiding injuries"). Drawing curtains prevents neighbors from peering into the private spaces of homes. Accordingly, the vantage-points from the proposed high-rise building do not bring the Project within the principle of *Rylands v. Fletcher*.

* *Auger Cast Pile Foundation*. Deep auger-cast pile foundations are common for large buildings. (10 RR 23-26, 35-36). The common usage of this type of foundation alone defeats the claim of strict liability. RESTATEMENT (Third) OF TORTS § 20, comment j ("the activity is not abnormally dangerous if it is in common usage"). Moreover, there is no proof that a large building on auger cast piles is inherently dangerous, even for this location. *See id.*, comment h. No proof exists to show that the dangers forecast by Plaintiffs' geotechnical expert, Mr. Ellman, could not be eliminated entirely simply by redesigning the foundation, such as by deepening the piers.[13] Therefore, strict liability cannot be predicated on the theory that the foundation is abnormally dangerous.

* *Garage Lighting*. In addition to the absence of pleadings to support a finding of nuisance on the basis of excessive lighting, there is no evidence that the type of lighting approved by the City of Houston for the parking garage of the Project will be abnormal and out of place in its surroundings in the relevant sense. *See* Settlement Agr. (DX 9). Ambient light is ubiquitous in the inner city. The commonality of this condition alone defeats the claim for

---

[13] During the balancing-of-the-equities hearing, 1717 offered unrebutted expert testimony establishing that the differential settlement as predicted by the Plaintiffs could be avoided by simply deepening the piles by approximately 15 to 20 feet, to reach the layer of compacted sand lying at a depth of 112 feet. (17 RR 112-25). Out of an abundance of caution, 1717 has adopted this proposal as part of its construction plans. (17 RR 73-75).

strict liability based on lighting.[14]  In addition, there is no proof that ambient light cannot be reduced or even blocked altogether by the exercise of reasonable care.  Thus, there is no evidence to support the imposition of strict liability on the theory that the lighting of the garage will be abnormally dangerous.

*Construction Annoyances*.  In addition to the absence of pleadings to support a nuisance due to construction noises, there is no evidence that the type of building construction contemplated at the Project site will be abnormal and out of place in its surroundings.  *See* PROSSER & KEETON ON TORTS, § 78, p. 551 (5th ed 1984) ("conditions and activities to which courts have refused to apply *Rylands v. Fletcher* . . . have been what the English courts would regard as a "natural" use of land, and not within the rule at all.  They include . . . vibrations from ordinary building construction. . . .") (footnotes omitted).

*Shadow Effect*.  Every building casts a shadow; hence, shadows are common wherever buildings are common, such as inside inner city areas.  Accordingly, strict liability cannot be imposed for damages allegedly caused by shadows.

\* \* \* \* \*

In summary, as a matter of law, strict liability does not apply on these facts.  No evidence exists to prove that the Project, if built, will be abnormal and out of place under the principle of *Rylands v. Fletcher*.  Thus, the Court should disregard all of the jury's affirmative findings of strict liability (Question 1) and render judgment for 1717 against all Prevailing Plaintiffs.

---

[14]  Plaintiffs made no attempt to show the delta between the garage lighting as proposed for the Project and the level of lighting produced by Maryland Manor Apartments.  (4 RR 240-41).

### F.	No Pleadings Exist to Support Claims Based on Excessive Light and Construction-Related Annoyances.

The Court lacks jurisdiction to enter judgment on unpled claims. *Latch v. Gratty, Inc.*, 107 S.W.3d 543, 546 (Tex. 2003); *Mapco, Inc. v. Carter*, 817 S.W.2d 686, 688 (Tex. 1991) ("A trial court judgment must conform to the pleadings of the parties.") (citing TEX. R. CIV. P. 301).

In this case, the Plaintiffs did not plead that they would be annoyed by lighting from the Project's garage. *See* 7th Amd. Pet. (CR 417-33). In addition, the Plaintiffs did not plead that temporary noises or other temporary annoyances from the construction of the Project will constitute a nuisance. *Id*. Accordingly, any claim for a nuisance based upon excessive lighting or construction-related annoyances was waived. The district court therefore erred in denying this ground of 1717's motion for JNOV. (CR 774).

### G.	There Is No Evidence That the Project, If Built, Will Substantially Interfere with the Use and Enjoyment of Non-Abutting Plaintiff Properties.

To prove that the Project, if built, will be a nuisance, Plaintiffs needed to prove that the Project will substantially interfere with the use and enjoyment of their land. CR 733; *see also Barnes v. Mathis*, 353 S.W.3d 760, 763 (Tex. 2011). In this case, Plaintiffs complained at trial of several features of the prospective Project that allegedly will cause some, or all of them, unreasonable discomfort or annoyance – additional traffic, shadow, loss of property value, foundation problems (for the abutting Plaintiffs only), excessive light, invasion of privacy, and construction-related annoyances.

For the reasons demonstrated below, no evidence exists to support a finding that any of these alleged impacts, taken together or in seriatim, will substantially interfere with the use or

enjoyment of the properties owned by any of the 16 Prevailing Plaintiffs whose properties do not abut 1717 Bissonnet (the non-abutting Plaintiffs).[15]

### 1. No Non-Abutting Plaintiff Will Experience Foundation Damage.

Because the Plaintiffs' geotechnical expert did not testify that the Project would damage the properties of the non-abutting Plaintiffs, the district court granted a directed verdict for 1717 to the extent that the claims of the non-abutting Plaintiffs were based on the allegation that the Project, if built, would damage their foundations. (9 RR 144-47, 163; CR 697-98).

### 2. Any Increase of Traffic on Public Streets Will Not Constitute Substantial Interference with the Use and Enjoyment of the Non-Abutting Plaintiffs' Properties.

Private nuisance is distinguished from public nuisance. RESTATEMENT (2d) OF TORTS § 822 cmt. a (1977); *see also Wallace v. Horn*, 506 S.W.2d 325, 329 (Tex. Civ. App. —Corpus Christi 1974, writ ref'd n.r.e.). Private nuisance is an invasion of a particular landowner's use and enjoyment of his or her own property; whereas public nuisance is an "unreasonable interference with a right common to the general public." RESTATEMENT, *supra*, § 821B(1); *see also Soap Corporation of America v. Balis*, 223 S.W.2d 957 (Tex. Civ. App.—Fort Worth 1949, writ ref'd n.r.e.) ("A nuisance is public if it affects a community at large, or if it affects a place where the public have a right to and do go, such as a park, street, or alley, and which nuisance necessarily annoys, offends, or injures those who come within the scope of its influence.").

---

[15] The non-abutting Plaintiffs are: (a) Lam Nguyen & Katherine Huong; (b) Suzanne Powell; (c) Michelle Jennings & Michael Tetzlaff; (d) James & Allison Clifton; (e) Kimberly Bell; (f) Richard & Mary Baraniuk; (g) Kenneth Reusser & Xanthi Couroucli; (h) Stephen Roberts; (i) Earle Martin; and (j) Norman & Suannah Rund.

44

City streets are public property. *West v. City of Waco*, 116 Tex. 472, 294 S.W. 832, 833-34 (1927). Obstructions that impede traffic flow on public streets can thus be public nuisances. RESTATEMENT, *supra*, § 821B, comment b (public nuisances include "interference with . . . the public convenience, as by the obstruction of a public highway"). However, that a traffic jam occurs on public streets in proximity of the plaintiff's residence and creates a mere inconvenience for the plaintiff does not, by itself, confer standing on the plaintiff to complain of the public nuisance. *See* RESTATEMENT, *supra*, § 821C, comment b ("when a public highway is obstructed and all who make use of it are compelled to detour a mile, no distinction is to be made between those who travel the highway only once in the course of a month and the man who travels it twice a day over that entire period").

Generally, private individuals lack standing to bring public nuisance suits. *See City of San Antonio v. Stumburg*, 70 Tex. 366, 7 S.W. 754, 755 (1888) ("[N]o action lies to restrain an interference with a mere public right, at the suit of an individual who has not suffered or is not threatened with some damage peculiar to himself."). Standing requires a showing the plaintiff has suffered a special damage peculiar to himself. *See McQueen v. Burkhart*, 290 S.W.2d 577, 579 (Tex. Civ. App.—Austin 1956, no writ) ("[W]hile an obstruction in a public road or street may constitute a public nuisance, for the abatement of which the government may maintain an equitable action, it does not follow that an individual citizen can obtain such relief merely by proof of the existence of such nuisance. He must go further and prove that it causes special and material injury to *some property right of his*.") (quoting *Ingram v. Turner*, 125 S.W. 327, 329 (Tex. Civ. App.—Fort Worth 1910, writ ref'd) (emphasis added)). Sporadic traffic jams do not

45

support liability for blocked access to private property. *See, e.g.*, *State v. Heal*, 917 S.W.2d 6, 11 (Tex. 1996) ("even when there is congestion, access is not materially and substantially denied").

In this case, the Plaintiffs alleged that the Project, if built, would significantly increase traffic through the public streets of the neighborhood, "creating unreasonable delays and negatively impacting the safety of its residential streets." *See* 7th Amend, Pet., at ¶ 22. At the Plaintiffs' request, however, the trial court submitted the case solely on the basis of an alleged private nuisance – a claim for interference with the use and enjoyment of "their land." *See* Jury Q No. 1 (CR 733). Over 1717's charge objection, the trial court refused to ask the jury one of the essential elements of a claim for public nuisance by these private parties – that is, whether any of the Plaintiffs will, if the Project is built, suffer some special, traffic-related injury distinct from delays and annoyances to be suffered by members of the general public. (14 RR 15). Nor did Plaintiffs request the court to submit this essential standing element to the jury.

Nor is there any evidence that the prospective increase in traffic in the vicinity of each non-abutting Plaintiff's tract will substantially interfere with the use and enjoyment of each such Plaintiff's property. *See City of Somerset v. Sears*, 313 Ky. 784, 233 S.W.2d 530, 532 (1950) ("The principal objection seems to be that up to a maximum of 400 automobiles for each show will go in and out of the theatre entrance, thereby creating noises, lights and congestions on the street in front of the theatre. We are not aware of any case which has ever gone so far as to hold that the use of property for business purposes, which increases the traffic on the public streets in the vicinity, constitutes a nuisance."). None of the Plaintiffs have alleged, proven, or

requested and received any jury finding that the Project would alter neighborhood traffic patterns in such a manner as to inflict a special damage peculiar to "their land."

In particular, the complete absence of evidence to show that Plaintiff Earl Martin has standing to complain about the prospect of increased traffic is fatal to his nuisance claim. Martin did not adduce a shred of evidence to prove that his property will be impacted by the Project in any way; his fear of increased traffic was his only complaint at trial. (3 RR 250-90; 4 RR 13-47). The liability finding for Martin (Q 1(24), CR 734) must therefore be vacated and the judgment for Martin reversed and rendered in favor of 1717. As to the other prevailing non-abutting Plaintiffs, the lack of standing is similarly fatal. The district court erred in denying 1717's motion for JNOV to the extent the liability findings for any of the Plaintiffs depends upon a subsumed finding that the Project, if built, will create traffic-related annoyances. (CR 760-62).

### 3. Shadow from the Tower Will Not Constitute Substantial Interference.

The Plaintiffs' claim that the shadow cast by the proposed 21-story apartment building is an invasion of their property rights harkens back to the long-discredited English common law doctrine of ancient lights. Texas, like most other states, has repudiated that doctrine. *See Klein v. Gehrung*, 25 Tex. 232 (Tex. 1860).

"Since the American common law has rejected the English doctrine of 'ancient lights,' there is no duty to avoid building on your property in such a way as to cut off a neighbor's access to natural light." *Justice v. CSX Transp., Inc.*, 908 F.2d 119, 122 (7th Cir. 1990) (Posner, J.); *see also Fontainebleau Hotel Corp. v. Forty-five Twenty-five, Inc.*, 114 So. 2d 257 (Fla.

47

App. 1959) (holding that asserted that nuisance law protects only those interests "which [are] recognized and protected by law," and that there is no protected right to access to sunlight.).

Moreover, even if Texas were to recognize a claim for blocked sunlight under some circumstances, there is no evidence on this record to show that the shadow effect of the proposed Project will substantially interfere with the use and enjoyment of each Plaintiff's property. Accordingly, the judgment for the Plaintiffs cannot be grounded on proof that the building, if built, will cast a shadow.

4.      Visual Access to the Non-Abutting Plaintiffs' Yards and Window Exteriors Will Not Constitute Substantial Interference.

Although the Plaintiffs did not plead or prove a stand alone invasion of privacy claim, the tort of invasion of privacy is embedded in their nuisance claims – the Project, they claim, will *facilitate* an invasion of privacy by future high rise tenants who might look into their back yards. No evidence exists to prove a nuisance on this hybrid theory.

First of all, there is no evidence to suppose that future tenants of the Project will invade the Plaintiffs' privacy. Invasion of privacy requires more than a mere passing glance into a neighboring backyard . It requires an intentional intrusion upon the seclusion of another that is highly offensive to a reasonable person. *GTE Mobilnet of S. Texas Ltd. Pshp. v. Pascouet*, 61 S.W.3d 599, 618 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). "One cannot expect to be entitled to seclusion when standing directly in front of a large window with the blinds open or while outside." *Vaughn v. Drennon*, 202 S.W.3d 308, 320 (Tex. App.—Tyler 2006, no pet.); *see also GTE Mobilnet*, 61 S.W.3d at 618 ("The mere fact that maintenance workers come to

48

an adjoining property as part of their work and look over into the adjoining yard is legally insufficient evidence of highly offensive conduct.").[16]  *cf. Manuel v. Cresleigh Homes Corp.*, 2007 Cal. App. Unpub. LEXIS 9789, at *13-14 (Cal. App. 3d Dist. Dec. 4, 2007) ("where (as here) a two-story house is properly permitted and constructed in accordance with the law, the owner of an adjacent one-story home cannot claim a *reasonable* expectation of privacy in his or her backyard as against observations made from the adjacent two-story house") (emphasis added);  *State ex rel. Reich v. City of Beachwood*, 158 Ohio App. 3d 588, 820 N.E.2d 936, 940 (2004) (rejecting claim for nuisance-based taking where defendant constructed a large building with sleeping quarters that overlooked the plaintiff's backyard).

5. The Garage Lighting Will Not Constitute Substantial Interference.

Even if garage lighting had been pled as a basis for nuisance – which it was not – no competent evidence exists to show that any of the non-abutting properties will experience light of such intensity as to substantially interfere with the use and enjoyment of those properties.

---

[16] *See also, e.g., United States v. Johnson*, 561 F.2d 832, 842 (D.C. Cir.) (not unreasonable for officer who observed narcotics operation through open window to wait half an hour for reinforcements before entering), *cert. denied*, 432 U.S. 907 (1977); *State v. Dickerson*, 313 N.W.2d 526, 532 (Iowa 1981) (not a search for police to look through window of front door, take photographs of the interior, and enlarge the pictures to reveal more detail); *State v. Crea*, 305 Minn. 342, 346, 233 N.W.2d 736, 740 (1975) (not unreasonable for police without warrant to shine light through basement window to view stolen snowmobiles inside); *California v. Ciraolo*, 476 U.S. 207, 213-14 (1986) (holding that warrantless aerial observation of fenced-in backyard within the curtilage of home was not unreasonable under the Fourth Amendment because the yard was observable to any person traveling by air); *cf. United States v. Conrad*, 578 F. Supp. 2d 1016, 1029 (N.D. Ill. 2008) ("Fourth Amendment does not prohibit a police officer's naked eye observations made of a constitutionally protected area from the vantage point of a public place").

6. Construction Activity Will Not Constitute Substantial Interference.

Even if construction activity had been pled as a basis for nuisance – which it was not – no competent evidence exists to show that any of the residents of the non-abutting properties will experience dust, noise, or vibrations from the construction of the Project, let alone any construction-related annoyances of such a magnitude as to substantially interfere with the use and enjoyment of those properties.

* * * * *

Accordingly, the judgment for each non-abutting Plaintiff should be reversed and rendered in favor of 1717, because no evidence exists to prove that the Project, if built, will constitute a nuisance for each such Plaintiff.

## H. Three Plaintiffs Failed to Prove Ownership.

A party has no justiciable interest and no standing to bring claims for damages to property it does not own. *See, e.g., Graves v. Diehl*, 958 S.W.2d 468, 472 (Tex. App.—Houston [14th Dist.] 1997, no writ). In order to recover under the merits of a nuisance claim, the Plaintiffs needed to prove their standing. *Freedman v. Briarcroft Property Owners, Inc.*, 776 S.W.2d 212, 215 (Tex. App.—Houston [14th Dist.] 1989, pet. denied).

Martha Gariepy (5308 Southhampton Estates) and James & Allison Clifton (1714 Wroxton Ct.) did not testify, and there is no other evidence proving that these three Plaintiffs have any justiciable interest in the properties in question at the time of trial. Accordingly, the verdict in favor of those Plaintiffs should be disregarded on the ground of lack of standing.

50

## I.    1717 Should Recover Taxable Costs.

In its motion for judgment and for JNOV, 1717 requested an award of all of its taxable costs against all Plaintiffs.  (CR 751-52, 780).  The trial court only awarded 1717 the cost of nine deposition transcripts against the Losing Plaintiffs, and awarded the Prevailing Plaintiffs all of their taxable costs.  (CR 1717).

Since 1717 should have been deemed the successful party in this suit within the meaning of TEX. R. CIV. P. 131, the Court of Appeals should thus reverse the award of costs to the Prevailing Plaintiffs and award costs as the district court should have – all taxable costs of court should be awarded to 1717.  *See* TEX. R. APP. P. 43.2(c) (appeals court can render judgment that the trial court should have rendered); *Ashley v. Bizzell*, 694 S.W.2d 349, 354-55 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.) (reversing and rendering cost award for appellant).

## VII.  PRAYER.

For the foregoing reasons, Appellant 1717 requests the Court to reverse the judgment for each Prevailing Plaintiff, render a take-nothing judgment for 1717 as to each and every Plaintiff, and render judgment that all Appellees, jointly and severally, pay 1717 its taxable appellate costs and that all Plaintiffs, jointly and severally, pay 1717 all of its taxable costs in the district court.   Appellant also requests any other and further relief to which it may be entitled.

Respectfully submitted,

By:   /s/ *Ramón G. Viada III*
          Ramón G. Viada III
          State Bar No. 20559350
          VIADA & STRAYER
          17 Swallow Tail Court
          The Woodlands, Texas 77381
          (281) 419-6338
          (281) 419-8137 (Fax)
          Email: rayviada@viadastrayer.com

          H. Fred Cook
          State Bar No. 04732500
          WILSON, CRIBBS & GOREN, P.C.
          2500 Fannin Street
          Houston, Texas 77002
          (713) 222-9000
          (713) 229-8824 (Fax)
          Email: hfcook@wcglaw.net

          ATTORNEYS FOR APPELLANT
          1717 BISSONNET, LLC

## CERTIFICATE OF SERVICE

I certify that all counsel of record have been served a copy of the foregoing Appellant's Brief by electronic submission for filing and service on April 8, 2015, through an approved EFSP of the Texas Online EFiling for Courts.

       Jean C. Frizzell
       Reynolds, Frizzell, Black, Doyle,
       Allen and Oldham LLP
       1100 Louisiana Street, 3500
       Houston, Texas 77002

          /s/ *Ramon G. Viada III*
          Ramon G. Viada III

## CERTIFICATE OF COMPLIANCE

Pursuant T.R.A.P. 9.4 (i)(3), the undersigned certifies that this Brief complies with the type-volume limitations of T.R.A.P. 9.4 (i)(2)(D).

1.  Exclusive of the exempted portions of T.R.A.P. 9.4(i)(1), this Brief contains 13,648 words as indicated by the word count function of the below referenced software.

2.  This Brief has been prepared in proportionally space typeface using:

    Typeface and Font Size:   Times New Roman, 14 pt; footnotes are in 12.5 pt. size.


        /s/ *Ramon G. Viada III*
         Ramon G. Viada III

CAUSE NO. 2013-26155

| | | |
|---|---|---|
| Penelope Loughhead, et al. | § | IN THE DISTRICT COURT OF |
| | § | |
| v. | § | HARRIS COUNTY, T E X A S |
| | § | |
| 1717 Bissonnet, LLC | § | 157th JUDICIAL DISTRICT |



## CHARGE OF THE COURT

**Members of the Jury:**

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any special knowledge or experiences with the other jurors. Do not use your phone or any other electronic device during your deliberations for any reason. I have given you a number where others may contact you in case of an emergency.

Any notes you have taken are for your own personal use. You may take your notes back into the jury room and consult them during deliberations, but do not show or read your notes to your fellow jurors during your deliberations. Your notes are not evidence. Each of you should rely on your independent recollection of the evidence and not be influenced by the fact that another juror has or has not taken notes.

You must leave your notes with the bailiff when you are not deliberating. The bailiff will give your notes to me promptly after collecting them from you. I will make sure your notes are kept in a safe, secure location and not disclosed to anyone. After you complete your deliberations, the bailiff will collect your notes. When you are released from jury duty, the bailiff will promptly destroy your notes so that nobody can read what you wrote.

Here are the instructions for answering the questions.

1. Do not let bias, prejudice, or sympathy play any part in your decision.

2. Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not admitted in the courtroom.

730

3. You are to make up your own minds about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow all of my instructions.

4. If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

5. All the questions and answers are important. No one should say that any question or answer is not important.

6. Answer "yes" or "no" to all questions unless you are told otherwise. A "yes" answer must be based on a preponderance of the evidence unless you are told otherwise. Whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence unless you are told otherwise.

The term "preponderance of the evidence" means the greater weight of credible evidence presented in this case. If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

7. Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

8. Do not answer questions by drawing straws or by any method of chance.

9. Some questions might ask you for a dollar amount. Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average.

10. Do not trade your answers. For example, do not say, "I will answer this question your way if you answer another question my way."

11. Unless otherwise instructed, the answers to the questions must be based on the decision of at least 10 of the 12 jurors. The same 10 jurors must agree on every answer. Do not agree to be bound by a vote of anything less than 10 jurors, even if it would be a majority.

As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and would require the taxpayers of this county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses

who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

## Definitions

A.     Plaintiffs mean the property owners who are plaintiffs in this action:

1.     Luong Nguyen, 1750 Wroxton Ct.
2.     Lam Nguyen & Katherine Hoang, 1801 Bissonnet
3.     Jamie Flatt, 1740 Wroxton Ct.
4.     Penelope Loughhead, 1736 Wroxton Ct.
5.     Donald Verplancken, 1734 Wroxton Ct.
6.     Norman & Suannah Rund, 1726 Wroxton Ct.
7.     Achim & Diana Bell, 5300 Southhampton Estates
8.     Jeanne Meis, 5302 Southhampton Estates
9.     Mary Van Dyke, 5304 Southhampton Estates
10.    Ralph & Leslie Miller, 5306 Southhampton Estates
11.    Yin & Surong Zhang, 5310 Southhampton Estates
12.    Martha Gariepy, 5308 Southhampton Estates
13.    Stephen Roberts, 1804 Wroxton Rd.
14.    Suzanne Powell, 5305 Southhampton Estates
15.    Michelle Jennings & Dr. Michael Tetzlaff, 5309 Southhampton Estates
16.    James & Allison Clifton, 1714 Wroxton Ct.
17.    Kimberley Bell, 1729 Wroxton Ct.
18.    Richard & Mary Baraniuk, 1731 Wroxton Ct.
19.    Dinzel Graves, 5219 Dunlavy
20.    Kenneth Reusser & Xanthi Couroucli, 1801 Wroxton Rd.
21.    Sarah Morian & Michael Clark, 1810 Bissonnet
22.    Marc Favre-Massartic, 1812 Bissonnet
23.    Raja Gupta, 1808 Wroxton Rd.
24.    Earle Martin, 1811 Wroxton Rd.
25.    Laura Lee & Dico Hassid, 1731 South Blvd.
26.    Peter & Adriana Oliver, 5219 Woodhead
27.    Ed Follis, 1823 Bissonnet
28.    Frank & Jeanette Stokes, 1826 Wroxton Rd.
29.    Steven Lin & Dr. Yi-Wen Michelle Pu, 1710 South Blvd.
30.    Howard & Phyllis Epps, 1936 Wroxton Rd.

B.     "1717 Bissonnet" means the defendant 1717 Bissonnet, LLC.

C.     The "Project" means the 21-story mixed-use building that 1717 Bissonnet proposes to construct at the corner of Bissonnet Road and Ashby St.

.

732

## Question No. 1:

Is 1717 Bissonnet's proposed Project abnormal and out of place in its surroundings such that it will constitute a private nuisance if built?

1717 Bissonnet creates a "private nuisance" if its Project substantially interferes with Plaintiffs' use and enjoyment of their land.

"Substantial interference" means that the Project must cause unreasonable discomfort or unreasonable annoyance to a person of ordinary sensibilities attempting to use and enjoy the person's land. It is more than a slight inconvenience or petty annoyance.

A nuisance, if it exists, is not excused by the fact that it arises from an operation that is in itself lawful or useful.

Answer "Yes" or "No" for each plaintiff:

| | Plaintiff | Answer |
|---|---|---|
| 1. | Luong Nguyen<br>1750 Wroxton Ct. | Yes |
| 2. | Lam Nguyen & Katherine Hoang<br>1801 Bissonnet | Yes |
| 3. | Jamie Flatt<br>1740 Wroxton Ct. | Yes |
| 4. | Penelope Loughhead<br>1736 Wroxton Ct. | Yes |
| 5. | Donald Verplancken<br>1734 Wroxton Ct. | Yes |
| 6. | Norman & Suannah Rund<br>1726 Wroxton Ct. | Yes |
| 7. | Achim & Diana Bell<br>5300 Southhampton Estates | Yes |
| 8. | Jeanne Meis<br>5302 Southhampton Estates | Yes |
| 9. | Mary Van Dyke<br>5304 Southhampton Estates | Yes |

733

| | | |
|---|---|---|
| 10. | Ralph & Leslie Miller<br>5306 Southhampton Estates | Yes |
| 11. | Yin & Surong Zhang<br>5310 Southhampton Estates | Yes |
| 12. | Martha Gariepy<br>5308 Southhampton Estates | Yes |
| 13. | Stephen Roberts<br>1804 Wroxton Rd. | Yes |
| 14. | Suzanne Powell<br>5305 Southhampton Estates | Yes |
| 15. | Michelle Jennings & Dr. Michael Tetzlaff<br>5309 Southhampton Estates | Yes |
| 16. | James & Allison Clifton<br>1714 Wroxton Ct. | Yes |
| 17. | Kimberley Bell<br>1729 Wroxton Ct. | Yes |
| 18. | Richard & Mary Baraniuk<br>1731 Wroxton Ct. | Yes |
| 19. | Dinzel Graves<br>5219 Dunlavy | No |
| 20. | Kenneth Reusser & Xanthi Couroucli<br>1801 Wroxton Rd. | Yes |
| 21. | Sarah Morian & Michael Clark<br>1810 Bissonnet | No |
| 22. | Marc Favre-Massartic<br>1812 Bissonnet | No |
| 23. | Raja Gupta<br>1808 Wroxton Rd. | No |
| 24. | Earle Martin<br>1811 Wroxton Rd. | Yes |

734

25. Laura Lee & Dico Hassid
    1731 South Blvd.                                NO

26. Peter & Adriana Oliver
    5219 Woodhead                                   NO

27. Ed Follis
    1823 Bissonnet                                  NO

28. Frank & Jeanette Stokes
    1826 Wroxton Rd.                                NO

29. Steven Lin & Dr. Yi-Wen Michelle Pu
    1710 South Blvd.                                NO

30. Howard & Phyllis Epps
    1936 Wroxton Rd.                                NO

735

Answer Question 2 if you answered "Yes" for any plaintiff in Question No. 1. Answer only with respect to those plaintiffs, if any, for whom you answered "Yes" in Question No. 1. Otherwise, do not answer Question No. 2.

## Question No. 2:

What sum of money, if paid now in cash, would fairly and reasonably compensate plaintiffs for their damages, if any, proximately caused by the nuisance?

Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not include interest on any amount of damages you find.

1. Loss of Market Value. Consider the difference in market value of each plaintiff's property caused by the nuisance. Market value means the amount that would be paid in cash by a willing buyer who desires to buy, but is not required to buy, to a willing seller who desires to sell, but is under no necessity of selling.

2. Loss of Use and Enjoyment of the Property.

Answer separately, in dollars and cents, for damages, if any.

| Plaintiff | Loss of Market Value Answer | Loss of Use & Enjoyment Answer |
|---|---|---|
| 1. Luong Nguyen 1750 Wroxton Ct. | $88,050 | 17,620.20 |
| 2. Lam Nguyen & Katherine Hoang 1801 Bissonnet | 25,932.25 | 25,932.25 |
| 3. Jamie Flatt 1740 Wroxton Ct. | 84,888 | 21,222 |
| 4. Penelope Loughhead 1736 Wroxton Ct. | 90,288 | 22,572 |
| 5. Donald Verplancken 1734 Wroxton Ct. | 72,252 | 18,063 |
| 6. Norman & Suannah Rund 1726 Wroxton Ct. | 96,630 | 24,157,50 |
| 7. Achim & Diana Bell 5300 Southhampton Estates | 80,471.04 | 20,117,76 |

| # | Name / Address | | |
|---|---|---|---|
| 8. | Jeanne Meis<br>5302 Southhampton Estates | 79,891.20 | 19,972.80 |
| 9. | Mary Van Dyke<br>5304 Southhampton Estates | 88,680.60 | 17,736.12 |
| 10. | Ralph & Leslie Miller<br>5306 Southhampton Estates | 94,528.80 | 18,905.76 |
| 11. | Yin & Surong Zhang<br>5310 Southhampton Estates | 102,483.00 | 20,496.60 |
| 12. | Martha Gariepy<br>5308 Southhampton Estates | 88,065.00 | 17,613.00 |
| 13. | Stephen Roberts<br>1804 Wroxton Rd. | 47,693.50 | 47,693.50 |
| 14. | Suzanne Powell<br>5305 Southhampton Estates | 20,191.68 | 13,461.12 |
| 15. | Michelle Jennings & Dr. Michael Tetzlaff<br>5309 Southhampton Estates | 17,613.00 | 11,742.00 |
| 16. | James & Allison Clifton<br>1714 Wroxton Ct. | 29,850.30 | 19,900.20 |
| 17. | Kimberley Bell<br>1729 Wroxton Ct. | 24,097.50 | 16,065.00 |
| 18. | Richard & Mary Baraniuk<br>1731 Wroxton Ct. | 21,596.04 | 14,397.36 |
| 19. | Dinzel Graves<br>5219 Dunlavy | 0 | 0 |
| 20. | Kenneth Reusser & Xanthi Couroucli<br>1801 Wroxton Rd. | 33,636.69 | 33,636.69 |
| 21. | Sarah Morian & Michael Clark<br>1810 Bissonnet | 0 | 0 |
| 22. | Marc Favre-Massartic<br>1812 Bissonnet | 0 | 0 |

23. Raja Gupta
    1808 Wroxton Rd.

24. Earle Martin
    1811 Wroxton Rd.
    36,923.58    36,923.58

25. Laura Lee & Dico Hassid
    1731 South Blvd.

26. Peter & Adriana Oliver
    5219 Woodhead

27. Ed Follis
    1823 Bissonnet

28. Frank & Jeanette Stokes
    1826 Wroxton Rd.

29. Steven Lin & Dr. Yi-Wen Michelle Pu
    1710 South Blvd.

30. Howard & Phyllis Epps
    1936 Wroxton Rd.

738

**Presiding Juror:**

1. When you go into the jury room to answer the questions, the first thing you will need to do is choose a presiding juror.

2. The presiding juror has these duties:

a. have the complete charge read aloud if it will be helpful to your deliberations;
b. preside over your deliberations, meaning manage the discussions, and see that you follow these instructions;
c. give written questions or comments to the bailiff who will give them to the judge;
d. write down the answers you agree on;
e. get the signatures for the verdict certificate; and
f. notify the bailiff that you have reached a verdict.

Do you understand the duties of the presiding juror? If you do not, please tell me now.

**Instructions for Signing the Verdict Certificate:**

1. Unless otherwise instructed you may answer the questions on a vote of 10 jurors. The same 10 jurors must agree on every answer in the charge. This means you may not have one group of 10 jurors agree on one answer and a different group of 10 jurors agree on another answer.

2. If 10 jurors agree on every answer, those 10 jurors sign the verdict.

If 11 jurors agree on every answer, those 11 jurors sign the verdict.

If all 12 of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

3. All jurors should deliberate on every question. You may end up with all 12 of you agreeing on some answers, while only 10 or 11 of you agree on other answers. But when you sign the verdict, only those 10 who agree on every answer will sign the verdict.

Do you understand these instructions? If you do not, please tell me now.

_____
Judge Presiding

739

**Verdict Certificate**

Check one:

_X_ Our verdict is unanimous. All 12 of us have agreed to each and every answer. The presiding juror has signed the certificate for all 12 of us.

_____          _____
Signature of Presiding Juror                            Printed Name of Presiding Juror


_____ Our verdict is not unanimous. Eleven of us have agreed to each and every answer and have signed the certificate below.

_____ Our verdict is not unanimous. Ten of us have agreed to each and every answer and have signed the certificate below.


SIGNATURE                                       NAME PRINTED

1. _____          _____

2. _____          _____

3. _____          _____

4. _____          _____

5. _____          _____

6. _____          _____

7. _____          _____

8. _____          _____

9. _____          _____

10. _____          _____

11. _____          _____

740

**CAUSE NO. 2013-26155**

| | | |
|---|---|---|
| Penelope Loughhead, et al. | § | In the District Court of |
| | § | |
| v. | § | Harris County, Texas |
| | § | |
| 1717 Bissonnet, L.L.C. | § | 157th Judicial District |

<u>Opinion and Order</u>

In November and December 2013, this case was tried to a jury. That jury found that a proposed high rise development at 1717 Bissonnet would constitute a nuisance if built to 20 of 30 plaintiff homeowners who lived near the proposed project. That same jury awarded damages to those 20 prevailing plaintiffs. The 20 prevailing plaintiffs have now moved this Court for a permanent injunction enjoining the defendant from constructing the project rather than awarding damages. For the reasons stated here and in defendant's opposition briefs, plaintiffs' request for a permanent injunction is denied. The Court instead enters judgment awarding partial damages to the prevailing plaintiffs and a take nothing judgment to the 10 plaintiffs who did not prevail.

**I.     Factual Background**

This case involves a 1.6 acre tract located at 1717 Bissonnet (the "Property"). Since the early 1960's, Maryland Manor Apartments occupied the Property, ultimately growing to 67 units. In 2007, Buckhead Investment Partners acquired Maryland Manor and began plans to construct a 23 story multi-use development consisting of a five-level parking garage and 18 floors of apartments. On July 30, 2007, Buckhead filed its foundation and site work permit application with the City of Houston and on August 28, 2007, Buckhead advised the neighborhood association of its plans.[1] The neighborhood opposition was rapid and intense. A

---

[1] Defendant's Ex. 104.

F I L E D
Chris Daniel
District Clerk
MAY 1 2014
1
Time: _____
Harris County, Texas
By _____
Deputy

RECEIVED AND POSTED
District Clerk
MAY 01 2014
Harris County, Texas
By_____
Deputy

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging

1199

neighborhood group called Stop Ashby High Rise was created and  signs in opposition to the Project appeared throughout the neighborhood.

The City of Houston initially approved the developer's Traffic Impact Analysis on September 4, 2007. However, on September 28, 2007, in response to neighborhood opposition, that approval was rescinded. Over the next several years, Buckhead revised its applications ten times; each time the application was rejected. In August 2009, Buckhead submitted a revised application under protest and subject to challenge of the project's previous denials.[2] On August 25, 2009, the City of Houston approved the revised project. Although the revised application was approved by the city, Buckhead continued to press for approval of the original application. In October 2009, Buckhead appealed the denial of its building permit to the City of Houston's General Appeals Board. The Appeals Board rejected the appeal and in December 2009, the Houston City Council upheld the decision of the Appeals Board. On April 9, 2010, Buckhead and Maryland Manor Associates filed suit against the city in federal court[3] complaining that Buckhead's previous applications were wrongfully denied. In February 2012, the City of Houston and Buckhead settled the federal action. In return for dismissing the lawsuit, the City of Houston agreed to approve the project provided the following changes were made:

- The project would be a 21 (rather than 23 as requested by Buckhead) story residential or mixed-use residential and commercial development on the Property with 228 residential high-rise units, 10,075 square feet of restaurant use, and four residential townhouses (the "Project");

---

[2] The revised project application called for a project that would generate only 120 p.m. peak hour automobile trips onto and off of Bissonnet. The original application, the denial of which Buckhead complained, would have generated a total of 184 p.m. peak hour trips.

[3] The action was originally filed in the 151st Dist. Court of Harris County, but was subsequently removed to federal court by the City of Houston.

2

- A pedestrian plaza must exist in the front of the Project with specified curb cuts on Ashby and Bissonnet;

- Traffic mitigation measures must be implemented including shuttle service and making bicycles available;

- Green wall screening must be constructed along the south and east walls of the parking garage;

- Lighting must be hooded or directed away from adjacent residences; and

- Noise mitigation must be implemented.[4]

This settlement agreement was publically announced on March 1, 2012.

## II. Procedural Background

On January 14, 2013, Penelope Loughhead filed an action under Rule 202 of the Texas Rules of Civil Procedure to obtain pre-suit discovery about the construction plans for the Project. On March 4, 2013, this Court ordered defendant to provide certain construction information to plaintiff.

On May 1, 2013, six plaintiffs filed suit seeking damages and a permanent injunction to stop the Project.[5] Because of the previous Rule 202 suit, this action was transferred to this Court.[6]

Trial commenced on November 19, 2013[7] and ended with a jury verdict on December 17, 2013. The jury determined that the Project, if built, would constitute a nuisance to the owners of 20 of the 30 homes, but did not constitute a nuisance to owners of 10 homes. The jury awarded

---

[4] Defendant's Ex. 9.

[5] Over the next several months, many plaintiffs joined and exited the suit. At one point, there were more than 140 plaintiffs. However, many of those plaintiffs voluntarily withdrew their action. Ultimately, 45 plaintiffs representing 30 homes went to trial.

[6] Transferred by the Administrative Judge of the Civil Division pursuant to Harris County Local Rule 3.2.2.

[7] Because this controversy had lingered for six years, this Court placed the matter on an accelerated trial schedule in order to achieve a rapid resolution.

3

damages to the homeowners of the twenty prevailing homes. A hearing was held on March 31, 2014 and April 21, 2014 to determine whether and what type of judgment should be entered.[8]

There are several motions pending before this Court. Defendant has filed a motion for entry of judgment, for judgment NOV and to disregard jury findings. Specifically, defendant requests that a take nothing judgment be entered against the homeowners of the ten homes who lost at trial and that the court enter a judgment notwithstanding the verdict with respect to the homeowners of the twenty homes who prevailed ("20 Prevailing Plaintiffs").

Similarly, plaintiffs have filed an application for permanent injunction. Plaintiffs are not seeking damages in the event the Project is built. Rather, plaintiffs seek an injunction enjoining construction of the Project as it is currently planned and permitted.

### III.    The Jury Verdict

Initial examination needs to be given to the jury verdict. The jury was asked whether the Project, if constructed, would constitute a nuisance to each plaintiff. Plaintiffs were numbered 1-30. (list attached as Ex. A) Generally speaking, plaintiffs immediately adjacent to the Project prevailed and those living farther away or to the



north lost. As this graphic demonstrates, plaintiffs in black (19, 21-23; and 25-30) lost at trial. Plaintiffs in yellow prevailed to varying degrees.

---

[8] That hearing was originally scheduled for January 23, 2014, but at the request of the parties was moved to March 31, 2014.

4

Additionally, the jury was asked to assess damages to the prevailing plaintiffs in two categories: (1) diminution of market value to plaintiffs' homes if the Project is built; and (2) loss of use and enjoyment of their property if the Project is built. The jury awarded the 20 Prevailing Plaintiffs approximately $1.2 million for diminution of property value and over $400,000 for loss of use and enjoyment of their property.

## IV. Defendant's Motion for Judgment

As a threshold matter, defendant's motion for judgment against the plaintiffs in the ten homes who lost at trial is an easy and straightforward motion. That motion is granted. A take nothing judgment is entered against those plaintiffs.

## V. Defendant's Motion for Judgment Notwithstanding the Verdict

A trial court may grant a motion for judgment notwithstanding the verdict if the evidence is legally insufficient to support the jury's findings. *Rocor Int'l, Inc. v. National Union Fire Ins. Co.*, 77 S.W.3d 253, 268 (Tex. 2002). Courts must view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not. *Id.* at 807.

The jury was asked the following question:

**Question No. 1:**

Is 1717 Bissonnet's proposed Project abnormal and out of place in its surroundings such that it will constitute a private nuisance if built?

1717 Bissonnet creates a "private nuisance" if its Project substantially interferes with Plaintiffs' use and enjoyment of their land.

"Substantial interference" means that the Project must cause unreasonable discomfort or unreasonable annoyance to a person of ordinary sensibilities attempting to use and enjoy the person's land. It is more than a slight inconvenience or petty annoyance.

5

A nuisance, if it exists, is not excused by the fact that it arises from an operation that is in itself lawful or useful.

Thus, to prove that the Project was a private nuisance, plaintiffs had to show that it would be "abnormal and out of place in its surroundings," and that it substantially interferes with Plaintiffs' use and enjoyment of their land. In support of this proposition, plaintiffs argued that the following factors constituted a nuisance:

- Increased traffic;

- Loss of privacy;

- Foundation damage to adjacent landowners due to settlement;

- Increased light to adjacent landowners;

- Construction annoyances; and

- Shadow cast by the Project with resulting vegetation damage.

The question of whether a lawful structure can constitute a nuisance is not a new or novel issue to jurisprudence. Texas courts have long grappled with landowners complaining that proposed structures on adjacent land would constitute a nuisance. For example, our supreme court observed that "there is no question that foul odors, dust, noise, and bright lights—if sufficiently extreme—may constitute a nuisance." *Schneider Nat. Carriers, Inc. v. Bates*, 147 S.W.3d 264, 269 (Tex. 2004). *See also Bay Petroleum Corp. v. Crumpler*, 272 S.W.2d 318, 318-20 (Tex. 1963)(affirming jury verdict finding no nuisance since wind did not carry "obnoxious gases, fumes, odors and stenches" from gas-storage operations to plaintiffs' land in substantial quantities); *Parsons v. Uvalde Elec. Light Co.*, 106 Tex. 212, 163 S.W. 1, 1-2 (1914)(affirming jury verdict based on smoke, dust, and cinders from electric power plant); *Rosenthal v. Taylor, B. & H. Ry. Co.*, 79 Tex. 325, 15 S.W. 268, 269 (1891)(remanding nuisance claim base on stagnant water, noise, dust, smoke, and cinders caused by railroad operations).

6

In this case, defendant analyzes each of the complained of activities and argues that each of them, standing alone, is insufficient to constitute a nuisance. Plaintiffs characterize this as a divide and conquer argument. The court agrees with plaintiffs. The nuisance cases in Texas demonstrate that all evidence, taken together, is to be considered in determining whether a nuisance exists. *See Freedman v. Briarcroft Property Owners, Inc.*, 776 S.W.2d 212, 270 (Tex. App.—Houston [14th Dist.] 1989, writ denied)("whether a nuisance exists is a question to be determined not merely by a consideration of the thing itself, but with respect to all attendant circumstances"); *Schneider, supra at 269* (foul odors, dust, noise and bright lights—if sufficiently extreme—may constitute a nuisance"); *GTE Mobilnet of South Texas, Ltd. v. Pascouet*, 61 S.W.3d 599, 615 (Tex. App.—Houston [14th Dist.] 2001, pet. denied)(combination of noise and light constituted nuisance); *Lamesa Co-op Gin v. Peltier*, 342 S.W.2d 613, 616 (Tex. Civ. App.—Eastland 1961, writ ref'd n.r.e.)(loud noises, glaring lights, dust, odors, smoke and cotton lint combined to support nuisance finding).

The jury determined that the various complained of activities constituted a nuisance. There is sufficient evidence to support that finding. For the reasons stated in plaintiffs' response to defendant's motion for entry of judgment, for judgment NOV and to disregard jury findings, the jury's finding of nuisance will not be overturned.

## VI.    Damages v. Injunction

Affirming the jury's finding of nuisance is by no means the end of the inquiry. The court has, in effect, two options: permit the construction of the Project and award damages, or halt the Project and award no damages. Damages and an injunction are mutually exclusive. If an injunction is entered halting the Project, plaintiffs will suffer no damages. "Awarding both an injunction and damages as to future effects would constitute a double recovery." *Schneider,*

7

*supra* at 284. Plaintiffs have made it clear that they want an injunction rather than damages. For the reasons stated in defendant's trial brief on balancing the equities and defendant's other briefs, plaintiffs' application for injunction is denied. Some of the reasons to deny the application are discussed here.

**Standards for Issuing an Injunction**. Even when a nuisance is established, a permanent injunction is not automatic. In *Story*, our supreme court stated:

> Petitioners take the position that the jury having found the facts constituting the nuisance, they were entitled to the injunction abating the plant as a matter of right. We do not agree. We think that there should have been a balancing of equities in order to determine if an injunction should have been granted.

*Storey v. Central Hide & Rendering Co.*, 226 S.W.2d 615, 618 (Tex. 1950). Rather, a permanent injunction can only be issued when plaintiffs establish:

(a) The existence of a wrongful act;

(b) The threat of imminent harm;

(c) The existence of irreparable injury; and

(d) The absence of an adequate remedy at law.

*GTE Mobilnet of S. Tex. Ltd. v. Pascouet*, 61 S.W.3d 599, 620 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). Thus, the trial court must weigh "the respective conveniences and hardships of the parties and balance the equities." *Webb v. Glenbrook Owners Ass'n, Inc.*, 298 S.W.3d 374, 384 (Tex. App.—Dallas 2009, no pet.). If they are issued, injunctions must be narrowly drawn and precise; injunctions cannot be so broad as to enjoin a defendant from activities which are a lawful and proper exercise of rights. *Holubec v. Brandenberger*, 111 S.W.3d 32, 39-40 (Tex. 2003).

While the jury determines fact questions, the trial judge must balance the equities in the role of chancellor to determine whether to issue an injunction. As one court stated:

8

It is not within the jury's province to pass upon the issue of whether or not the private nuisance which would result from the [proposed use of the defendant's property] will be outweighed by the public welfare. This is not a fact issue, but one to be determined by the chancellor in accordance with established equitable principles.

*Georg v. Animal Defense League*, 231 S.W.2d 807, 811 (Tex. Civ. App.—San Antonio 1950, writ ref'd n.r.e.). The balancing of the equities lies within the trial court's sound discretion. *Lee v. Bowles*, 397 S.W.2d 923, 926 (Tex. Civ. App.—San Antonio 1965, no writ). In short, Texas law places the responsibility on the trial court.

**Finding of Nuisance was Very Localized.** As noted earlier, only some of the plaintiffs prevailed at trial. Generally speaking, only those plaintiffs immediately adjacent to the project or in close proximity won. All plaintiffs north of the Project lost. The Project was not deemed a nuisance to any plaintiff more than approximately 200 feet from the Project.

While it's not possible to know precisely what the jury was thinking, even plaintiffs' counsel at closing arguments conceded that this finding suggests that the jury rejected the traffic and shadow concerns raised by plaintiffs. At the minimum, the jury's finding makes clear that the Project is a nuisance to only a small band of plaintiffs and does not extend to the entire community.

**Difficulty in Enforcing an Injunction.** Plaintiffs request an injunction precluding defendant from constructing the Project as permitted by the City. Thus, the injunction would preclude a mixed use 21 story building consisting of retail on the ground floor, a five story parking garage, and 16 floors of apartments. This Project and only this Project was found to be a nuisance to 20 homeowners. If defendant sought to construct a 20 story project, there would be no finding that such a building would be a nuisance. A new trial would have to be conducted to determine if such a building would be a nuisance. Similarly, suppose defendant desired to erect

9

a mid-rise six story structure that spanned property line to property line and had more units than the currently permitted Project? Would such a project be a nuisance? Such a mid-rise would solve the height concerns of the neighborhood, but might have worse privacy and traffic concerns.

Plaintiffs suggest that this Court should enjoin the Project as permitted and then, if defendant tries to skirt the injunction by building a slightly smaller building, conduct a contempt hearing to see if defendant is complying with the injunction. Unfortunately, plaintiffs' suggestion is no solution. If defendant reduced the size of the building just slightly, defendant would clearly not be violating plaintiffs' proposed injunction since defendant would not be constructing the project as permitted.

In short, an order enjoining the construction of the Project as permitted would not resolve this controversy. Rather, the Court would be faced with a potentially endless series of lawsuits or contempt motions testing whether various tweaks and revisions of the Project would be a nuisance or a violation of the injunction.

Some amicus briefs have suggested that the court should enter an injunction precluding defendant from building anything more than 6 or 7 stories in height. Unfortunately, there's absolutely no evidence from which this court can determine what height is appropriate and what height is inappropriate. The jury (at plaintiffs' request) was simply asked whether the Project as permitted was a nuisance. The jury was not asked and the plaintiffs did not request a finding of what height or number of units would be permissible. As a result, any attempt to issue an injunction restricting the building to a certain number of floors would be sheer guesswork. This Court is faced with an all or nothing proposition—either completely enjoin the building as permitted or not. Unfortunately, as previously noted, a complete ban doesn't solve the

10

controversy. Defendant can comply with the injunction by simply shaving one floor off of the project.

Far from resolving this controversy, plaintiffs concede a permanent injunction would result in more suits and motions, including possible contempt motions and new suits. The Texas Supreme Court stated that "judges may hesitate to issue discretionary orders that require extensive oversight." *Schneider, supra*, 147 S.W.3d at 287. "Difficulties in drafting or enforcing an injunction may discourage the trial judge from considering the imposition of an equitable remedy." *Id.* at 289.

In the end, this Project is a residential development in a residential neighborhood. Plaintiffs' opposition is primarily scale—plaintiffs argue the project is simply too big. It is not as if the court could enter an injunction ordering defendant not to build a certain type of business, e.g., racetrack or hide tanning facility. Courts can and have entered injunctions in the past against such facilities. This case is different. A two story residential development was on the Property for decades. Maryland Manor was of no concern to the neighbors but a two story structure too small for the developer. A 21 story residential development is believed by the neighbors (and the jury) to be too big. However, this Court has zero evidence with which to find what size is just right.

### Harm to the Defendant.

The defendant has fought for seven years to construct this Project. Neighborhood opposition slowed the City of Houston permitting process. Ultimately, after being faced with litigation, the City of Houston approved the Project with certain agreed modifications in order to help alleviate neighborhood concerns. During all of this time, defendant spent millions of dollars planning and designing the project. Indeed, while the neighbors fought and organized against the

11

Project, no suit was filed. Even after the City approved the developers contested application, no suit was filed. More importantly, even after the City and the developers entered into a settlement agreement to permit the project to go forward, no suit was filed against the Project for over a year. Meanwhile, defendant continued to expend money and energy to go forward with the Project. Suit was not filed until May of 2013 against the Project. The delay in filing suit while defendant continued to spend money and, indeed, raze the Maryland Manor Apartments which generated cash flow, cannot be ignored.

One of the factors that must be considered by this Court is balancing the equities. To be sure, construction of the Project will cause some hardship and disruption to the plaintiffs. Enjoining the Project, however, will cause considerable hardship to defendant. While the defendant could sell the Property and recoup some of its losses, in no way could defendant come out whole. Defendant has considerable sunk costs in design and engineering fees. This effort and work cannot simply be picked up and moved to a new location. The injunction requested by plaintiffs would cause considerable hardship on defendant.

### Harm to the Community.

One of the factors that this Court must consider in determining whether to grant an injunction is harm to the public or community. As stated by our supreme court, the law of nuisance grew out of localized issues, such as a hog farm or tannery, "small-scale operations that like most others in pre-industrial England had little economic impact on anyone other than the parties." *Schneider, supra* at 287. Now, however,

> [i]ndustries and nuisances often come in much larger packages, with effects on the public, the economy, and the environment far beyond the neighborhood. A court sitting in equity today must consider those effects by balancing the equities before issuing any injunction. *Id.*

12

If an injunction is granted, there is no question but that it will have a chilling effect on other development in Houston. For better or worse, the City of Houston has repeatedly opted against zoning. Houston's lack of zoning is often touted as part of the DNA of the city.

However, while there is not technically zoning, one witness testified that the City of Houston vigorously enforces its ordinances and codes. Obtaining a building permit is by no means a given. In this case, the defendant went through years of considerable effort to obtain approval for the Project. Ten different applications were made to the City. One project alternative was approved, litigation filed, and ultimately the 21 story Project was approved by the City.

If an injunction was issued, then a judge can become a one man zoning board with little criteria. Two different courts could examine two similar projects and reach contrary conclusions. Even after developers obtained a building permit, developers would have no idea whether a proposed project would pass judicial scrutiny. Moreover, while building codes and ordinances are quite detailed, the criteria of what constitutes a nuisance is considerably less specific. Here, the definition of nuisance is simply whether a project, if built, would be abnormal and out of place in its surroundings.

Currently, developers are faced with a lengthy permitting process where the rules are defined. If developers are confronted with a second step—a possibility of an injunction— developers might think twice about whether to proceed. This is particularly true since this second step, litigation and resulting appeals, would take years to complete.

As Houston becomes more and more urbanized and denser, perhaps Houston should reconsider whether zoning is appropriate for this City. That is not for this Court to decide.

13

Rather, this Court must simply balance the equities. On balance, the Court concludes that an injunction should not be issued.

Does this mean that an injunction can never be issued to stop a proposed project? Of course not. But in weighing the equities in this case, the equities weigh toward no injunction.

Finally, the Project will provide benefits to the city as a whole. The Project will generate millions in tax revenues and provide housing for the medical center, Rice, and other urban destinations. While the Project might increase traffic along Bissonnet, it will contribute toward reduction in urban sprawl and congestion on freeways feeding the city center.

### City Approval.

Similarly, it must be remembered that the City of Houston approved this project and extracted concessions from the defendant in the process. As part of the settlement of the federal lawsuit, the city agreed to issue a permit for the project so long as defendant made certain design changes, including (a) reducing the height of the building from 23 to 21 stories; (b) imposing traffic, light and noise mitigation measures; and (c) green wall screening on the parking garage. While this procedure was not the same as zoning, this Court cannot ignore the fact that the city (a) approved the project; and (b) extracted concessions to help ameliorate many of the neighborhood concerns.

Defendant followed all of the rules required of the City.

### Other Projects Nearby.

Mid-rise buildings are sprouting up throughout the inner city. Indeed, two blocks from the proposed Project is a six story residential development at the corner of Ashby and Sunset and several four story residential developments are across the street on Sunset. Moreover, a six story

14

medical office building is 2-3 blocks away on Sunset. Thus, this neighborhood is becoming dense even without this Project.

**Privacy Concerns Pre-dated the Project**. One of plaintiffs' concerns is that the Project, if it went forward, would permit an invasion of privacy into the plaintiffs' homes and back yards. This is a fact of life in urban settings. Any time a two story home is erected next door, the new neighbors will have an opportunity to peer into your back yard. Indeed, plaintiffs were subjected to such an invasion of privacy when Maryland Manor Apartments occupied the Property. Maryland Manor was razed in May 2013. However, prior to demolition, defendant took pictures

from second story apartments overlooking plaintiffs' property.[9] While plaintiffs testified that they had no privacy concerns with Maryland Manor, the pictures introduced at trial unquestionably show that Maryland Manor residents could look down into plaintiffs' property. If anything, privacy concerns from Maryland Manor could have been worse than



potential privacy concerns from the Project. Maryland Manor was literally inches from the property line, whereas the Project will be set back 10 feet. Maryland Manor had second story

---

[9] Defendant Ex. 2.

1213

apartments overlooking plaintiffs' back yards, whereas the Project will have a parking garage occupying the first five floors. Additionally, the Project's apartments will be located in a tower set back even farther. The potential nuisance concerns from the Project are not enough to justify an injunction stopping the Project.

### Adequate Remedy at Law.

One of the factors to be considered in deciding whether to grant an injunction is whether the plaintiffs have an adequate remedy at law, i.e., whether they can be compensated in damages.[10] The jury has weighed in on this issue and awarded damages to the plaintiffs. The jury determined that the prevailing plaintiffs' homes would be diminished in value by ranges of 3-15%.[11] One of plaintiffs' principal arguments at trial was that the Project would cause settlement and foundation damage to adjacent properties. Even if such foundation damage occurred, this is precisely the type of injury for which courts routinely award damages. Plaintiffs clearly have an adequate remedy at law.

### Other Factors to be Considered.

There are a couple of other factors that need to be identified, although they are of lesser importance.

**A. Some Plaintiffs Chose to Buy Homes in the Neighborhood Despite the Possibility of the Project being Built.** Several plaintiffs bought their homes during the pendency of the controversy from 2007 to the present. While the law is clear that this does not disqualify a plaintiff from obtaining damages for a proposed nuisance, *See, e.g., Galveston, H. & S.A. Ry. Co. v. Miller*, 93 S.W. 177, 179 (Tex. Civ. App. 1906, writ ref'd), it is a factor that cannot be

---

[10] Although §65.001 of the Texas Civil Practice and Remedies Code appears to abolish the requirement of showing irreparable injury, subsequent decisions hold that the irreparable injury requirement still exists. *See* Sonwalkar v. St. Luke's Sugar Land Partnership, LLP, 374 S.W.3d 186 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

[11] Defendant's Ex. 166.

ignored in determining whether to enjoin the Project. Even in the face of this project, some plaintiffs chose to move into the neighborhood.

**B. He who seeks equity must do equity.** An injunction is an equitable remedy. Courts have long held that he who seeks equity must do equity. *Truly v. Austin*, 744 S.W.2d 934, 938 (Tex. 1988). While most of the plaintiffs' conduct has been perfectly proper, there is no question but that many neighbors and some plaintiffs aggressively fought the project. Threats were made against the developers. Petitions were circulated that threatened to picket the homes of investors, appear at businesses and homes of contractors and service providers who work on the project, confront tenants in the neighborhood and let them know they are not welcome, boycott and demonstrate against any restaurant at the project as well as any other location of the same restaurant. In short, "we will appear at the homes of the owners, investors, and chef of your restaurant tenant and demonstrate our opposition to their presence in our neighborhood."[12]

## Conclusion on Injunction.

For the reasons stated here, and for the reasons stated in Defendant's briefing, the application for injunction is denied.

## VII. Damages

If an injunction is denied, and if the plaintiffs do indeed have an adequate remedy at law, then the final question for the court is what amount of damages to award. The jury was asked to determine what sum of money, if paid now in cash, would fairly and reasonably compensate plaintiffs for their damages in two areas: (a) loss of market value; and (b) loss of use and enjoyment of their property.

---

[12] Defendant Ex. 36.

17

Defendant argues that the jury findings on both elements of damages should be disregarded because, among other reasons, the damages are not yet ripe and are speculative. The Court agrees in part and disagrees in part. Because the Project has not yet been constructed, the Court agrees that damages for loss of use and enjoyment should not be awarded at this time. Determination of the extent to which the Project may interfere with plaintiffs' use and enjoyment of their property is speculative until the project is constructed. *See Allen v. City of Texas City,* 775 S.W.2d 863 (Tex. App.—Houston [1st Dist.] 1989, writ denied).

With respect to lost market value damages, however, the Court agrees with Plaintiffs that these damages have already occurred. Evidence was presented at trial that plaintiffs have already incurred lost market value damages as a result of the planned Project.

## VIII. Conclusion

This Court finds and orders as follows:

1.      Defendant's Motion for Entry of Judgment with respect to the ten plaintiffs who lost at trial is granted;

2.      Defendant's Motion for Judgment Notwithstanding the Verdict is Denied;

3.      Defendant's Motion to Disregard Jury Findings is Granted with respect to loss of use and enjoyment damages and denied with respect to loss of market value damages;

4.      Plaintiffs' Application for Permanent Injunction is denied.

5.      The parties are to prepare a judgment consistent with this opinion.

Signed May 1, 2014.

_____
Hon. Randy Wilson
Judge 157th Dist. Court

18

## Ex. A

1.   Luong Nguyen, 1750 Wroxton Ct.
2.   Lam Nguyen & Katherine Hoang, 1801 Bissonnet
3.   Jamie Flatt, 1740 Wroxton Ct.
4.   Penelope Loughhead, 1736 Wroxton Ct.
5.   Donald Verplancken, 1734 Wroxton Ct.
6.   Norman & Suannah Rund, 1726 Wroxton Ct.
7.   Achim & Diana Bell, 5300 Southhampton Estates
8.   Jeanne Meis, 5302 Southhampton Estates
9.   Mary Van Dyke, 5304 Southhampton Estates
10.  Ralph & Leslie Miller, 5306 Southhampton Estates
11.  Yin & Surong Zhang, 5310 Southhampton Estates
12.  Martha Gariepy, 5308 Southhampton Estates
13.  Stephen Roberts, 1804 Wroxton Rd.
14.  Suzanne Powell, 5305 Southhampton Estates
15.  Michelle Jennings & Dr. Michael Tetzlaff, 5309 Southhampton Estates
16.  James & Allison Clifton, 1714 Wroxton Ct.
17.  Kimberley Bell, 1729 Wroxton Ct.
18.  Richard & Mary Baraniuk, 1731 Wroxton Ct.
19.  Dinzel Graves, 5219 Dunlavy
20.  Kenneth Reusser & Xanthi Couroucli, 1801 Wroxton Rd.
21.  Sarah Morian & Michael Clark, 1810 Bissonnet
22.  Marc Favre-Massartic, 1812 Bissonnet
23.  Raja Gupta, 1808 Wroxton Rd.
24.  Earle Martin, 1811 Wroxton Rd.
25.  Laura Lee & Dico Hassid, 1731 South Blvd.
26.  Peter & Adriana Oliver, 5219 Woodhead
27.  Ed Follis, 1823 Bissonnet
28.  Frank & Jeanette Stokes, 1826 Wroxton Rd.
29.  Steven Lin & Dr. Yi-Wen Michelle Pu, 1710 South Blvd.
30.  Howard & Phyllis Epps, 1936 Wroxton Rd.

19

1217

NO. 2013-26155

| | | |
|---|---|---|
| PENELOPE LOUGHHEAD, HOWARD | § | |
| EPPS, PHYLLIS GRIFFIN EPPS, EARLE | § | |
| MARTIN, JEANNE MEIS, STEPHEN | § | IN THE DISTRICT COURT OF |
| GLYNN ROBERTS, RICHARD G. | § | |
| BARANIUK, MARY SARAH BARANIUK, | § | |
| JAMES D. CLIFTON, ALLISON KELLY | § | |
| CLIFTON, JAMIE FLATT, MARTHA | § | |
| GARIEPY, RALPH KEN MILLER, JR., | § | |
| LESLIE M. MILLER, PETER STUART | § | |
| OLIVER, ADRIANA BOTTO OLIVER, | § | |
| NORMAN A. RUND, SUANNAH L. RUND, | § | |
| MARY THERESA VAN DYKE, ACHIM | § | HARRIS COUNTY, TEXAS |
| BELL, DIANA BELL, KIMBERLEY BELL, | § | |
| MARC M. FAVRE-MASSARTIC, ED B. | § | |
| FOLLIS, LAM NGUYEN, KATHERINE | § | |
| HOANG, LUONG NGUYEN, SUZANNE | § | |
| POWELL, KENNETH D. REUSSER, | § | |
| XANTHI I. COUROUCLI, FRANK T. | § | |
| STOKES, JEANETTE P. STOKES, | § | |
| MICHAEL H. CLARK, DINZEL R. | § | 157th JUDICIAL DISTRICT |
| GRAVES, MICHELLE JENNINGS, | § | |
| STEVEN K. LIN, SARAH C. MORIAN, | § | |
| YI-WEN MICHELLE PU, MICHAEL | § | |
| TETZLAFF, SURONG ZHANG, YIN | § | |
| ZHANG, RAJA GUPTA, DICO HASSID, | § | |
| LAURA R. LEE, DONALD VERPLANCKEN | § | |
| | § | |
| *Plaintiffs,* | § | *Jury Demanded* |
| | § | |
| v. | § | |
| | § | |
| 1717 BISSONNET, LLC. | § | |
| | § | |
| *Defendant* | § | |

## FINAL JUDGMENT

On the 19th day of November 2013, the above-entitled and numbered cause was called for trial. The parties announced ready through their attorneys of record. The Court empaneled a jury of twelve, and the case proceeded to trial. At the conclusion of the evidence, the jury reached a unanimous verdict on December 17, 2013. The jury found, as to 29 plaintiffs or 20 households, that



RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging



1271

the proposed high rise development at 1717 Bissonnet will constitute a nuisance if built. The jury awarded damages to those plaintiffs. A true and correct copy of the signed verdict form is attached as Exhibit 1 to this Final Judgment.

Following the verdict, the Defendant filed a motion for entry of judgment, for judgment NOV and to disregard jury findings. The Plaintiffs filed an application for permanent injunction. On May 1, 2014, this Court signed a memorandum opinion and order ruling on such motions and directed the parties to prepare a final judgment consistent with the memorandum opinion. Accordingly, it is

ORDERED, ADJUDGED, and FINALLY DECREED that each of the following Plaintiffs (hereinafter collectively. the "Prevailing Plaintiffs") have and recover from and against the Defendant the sum set forth beside the name of each such Plaintiff or Plaintiffs, as found by the jury for loss of market value to their properties:

1. Luong Nguyen – $88,050.00.

2. Lam Nguyen and Katherine Hoang, jointly – $25,932.25.

3. Jamie Flatt – $84.888.00.

4. Penelope Loughhead – $90,288.00.

5. Donald Verplancken – $72.252.00.

6. Norman and Suannah Rund, jointly – $96,630.00

7. Achim and Diana Bell, jointly – $80,471.04.

8. Jeanne Meis – $79,891.20.

9. Mary Van Dyke – $88,680 60.

10. Ralph and Leslie Miller, jointly – $94,528.80.

11. Yin and Surong Zhang, jointly – $102,483.00.

12. Martha Gariepy – $88,065.00.

13 Stephen Roberts – $47,693 50.

14. Suzanne Powell – $20,191.68.

15. Michelle Jennings and Michael Tetzlaff, jointly – $17,613.00.

16. James and Allison Clifton, jointly – $28,850.30

17. Kimberley Bell – $24,097.50.

18. Richard and Mary Baraniuk. jointly – $21,596.04.

19. Kenneth Reusser and Xanthi Couroucli, jointly – $33,636.69.

20. Earle Martin – $36,923.58.

This judgment is without prejudice to the Prevailing Plaintiffs' right to seek and recover damages for the loss of use and enjoyment of their properties resulting from the nuisance when such damages become ripe for judicial determination. It is further

ORDERED. ADJUDGED, and FINALLY DECREED that each of the twenty damage awards set forth above shall bear interest at the rate of 5%. compounded annually, until such judgment has been satisfied. It is further

ORDERED, ADJUDGED, and FINALLY DECREED that the following Plaintiffs (hereinafter collectively, the "Non-Prevailing Plaintiffs") shall TAKE NOTHING by this action against the Defendant: Dınzel Graves, Sarah Morian & Michael Clark, Marc Favre-Massartic, Raja Gupta, Laura Lee & Dico Hassid, Peter & Adrıana Oliver, Ed Follis, Frank & Jeanette Stokes. Steven Lin &Yi-Wen Michelle Pu, and Howard & Phyllıs Epps. It is further

ORDERED, ADJUDGED, and FINALLY DECREED that all costs of court are taxed against the Defendant, except the costs of the depositions of Michael Clark, Marc Favre-Massartic, Raja Gupta, Laura Lee, Adriana Oliver, Ed Follis, Frank Stokes, Steven Lin, and Phyllis Epps,

which are taxed against the Non-Prevailing Plaintiffs. It is further

ORDERED, ADJUDGED, and FINALLY DECREED that Plaintiffs' application for permanent injunction is DENIED.

All writs and processes for the enforcement and collection of the sums awarded by this Judgment or the costs of court may issue as necessary.

All relief not expressly granted herein is denied.

Signed this _____*18th*_____ day of _____*July*_____, 2014

HON. RANDY WILSON
JUDGE PRESIDING

APPROVED AS TO FORM BUT RESERVING ALL COMPLAINTS AS TO SUBSTANCE:

By: /s/ *Ramón G. Viada III*
      Ramón G. Viada III
      Texas Bar No. 20559350
      VIADA & STRAYER
      17 Swallow Tail Court
      The Woodlands, Texas 77381
      (281) 419-6338
      (281) 661-8887 (Fax)

      COUNSEL FOR DEFENDANT

APPROVED AS TO FORM BUT RESERVING ALL COMPLAINTS AS TO SUBSTANCE:

By: _/s/ Jean C. Frizzell_
     Jean C. Frizzell
     Texas Bar No. 07484650
     REYNOLDS, FRIZZELL, BLACK, DOYLE,
     ALLEN AND OLDHAM LLP
     1100 Louisiana Street, 3500
     Houston, Texas 77002
     (713) 485-7200
     (713) 485-7250 (Fax)

     COUNSEL FOR PLAINTIFFS

4848-4110-8507, v 2



DEFENDANT'S EXHIBIT
43



















D043169



D043168



D043153



D043154



D043170

LANDSCAPE DIM PLAN PLAZA
LEVEL 6

PROJECT "X"
Maryland Manor Associates

L101D

\\SrvStad_L/2007/07018/Project X\Sheets\L101D LANDSCAPE DIM PLAN PLAZA LEVEL 6.dwg, 9/18/2007 9:32:12 AM, DWF6 ePlot.pc3



PUTTING GREEN

SWIMMING POOL

UNRESTRICTED RESERVE A

BOCCE BALL COURT

PROJECT "X"
HOUSTON, TEXAS

GENERAL PLAN

D043165

6th FLOOR PLAZA PLAN





D043156

ASHBY STREET
60' ROW

LW5

EXIT

RE

LW4

LOADING

EXIT ONLY

LW3

LW2

RESIDENTIAL

LW1

LOT 1

**Ashby Streetscape**
**1717 Bissonnet**

Buckhead Investment Partners, Inc
10/24/07



BISSONNET STREET
70' R-O-W

ENTRY FOYER
FFE=49.70

LOADING

Bissonnet Streetscape
1717 Bissonnet

Buckhead Investment Partners, Inc
10/24/07

EDI architecture

D043157



Google earth

D043162



REPORTER'S RECORD

TRIAL COURT CAUSE NO. 2013-26155

COURT OF APPEALS NO. 14-14-00589-CV

VOLUME 14 OF 26 VOLUMES


PENELOPE LOUGHHEAD, ET AL.)   IN THE DISTRICT COURT
                            )
vs.                         )   HARRIS COUNTY, TEXAS
                            )
1717 BISSONNET, LLC         )   157TH JUDICIAL DISTRICT


_____

TRIAL ON ITS MERITS

DECEMBER 12, 2013

_____


On the 19th day of November, 2013, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Randy Wilson, Judge Presiding, held in Houston, Harris County, Texas.


Proceedings reported by computerized stenotype machine.

in despair because of the sheer virtual impossibility of formulating it.

And as a result, I am overruling that objection.

MS. SOUTHWICK: Thank you, Your Honor.

MR. VIADA: The defendants' fifth objection to the charge is to note that it omits an essential element of the plaintiffs' claim for private nuisance; that is, in connection with Question No. 1, the charge fails to instruct the jury that to find for each plaintiff on a claim for private nuisance, the jury must find that each such plaintiff has proved that he or she owns an interest in the land on which the nuisance has or will be felt by the plaintiff. That element was in the former proposed charge, but it's no longer in this one; and so we object to the omission of that element.

THE COURT: Give me that one again. Give me that one again, please. I just -- I didn't follow it.

MR. VIADA: Yes. There is no instruction that the jury must find that each plaintiff owns an interest in the land that they claim has been damaged by the prospective nuisance or will be damaged by the prospective nuisance.

THE COURT: Is that even an issue?

MR. VIADA: Well --

THE COURT: I mean, is there any evidence to the contrary?

MR. VIADA: Well, it's not our burden to put proof to the contrary. It's the plaintiffs' burden to put affirmative proof establishing that basic element of standing.

THE COURT: Understood. And I'm not suggesting it was your burden to establish proof to the contrary, but I didn't think that was a contested issue, frankly. But overruled.

MR. VIADA: The defendant objects to the Court's charge because it fails to instruct the jury on the essential elements of the claim for the proposed project's anticipated impact on traffic conditions, such as road congestion and increased traffic loads on community streets which are roads that have never been contested are owned by the plaintiffs. In particular, the charge doesn't ask any predicate findings for standing to bring a public nuisance claim such as whether each of the plaintiffs has or with reasonable certainty will suffer harm of a kind materially different from that suffered by other members of the public exercising the right common to the general public that is the subject of the feared interference.

THE COURT: Overruled.

MR. VIADA: The defendant objects to Question No. 2 because it would allow the jury to give the plaintiffs a double recovery by awarding loss of market value and lost use and enjoyment. Market value damages for permanent injury to real estate comprehends and includes loss of use and enjoyment of the land.

THE COURT: Isn't that solved, even if it is a problem, by the instruction of don't award a sum of money on one element if you have otherwise under another element awarded a sum of money for the same loss?

MR. VIADA: Well, then we are not in a position of knowing whether the jury followed that instruction.

THE COURT: Overruled.

Let me ask a question. I hate to interrupt, but I don't want to forget it.

Mr. Doyle, this might more appropriately be a question addressed to you.

We have had a fair number of attendees in the courtroom over the past several weeks. I suspect there will be even more for closing arguments.

MR. DOYLE: That would be my guess, Your Honor. I don't have a tally, but we have let them know when it is.

THE COURT: Should I reserve and conduct

closing arguments on 17? I guess a better way of putting it is is this courtroom physically large enough to accommodate?

MR. DOYLE: It may or may not be, I mean, but what I can do is try to find out.

THE COURT: Well, here is what I have done. I've gone ahead and reserved 17 and we'll play it by ear.

MR. DOYLE: Sure.

THE COURT: I don't want to exclude people just by virtue of seating capacity. So for now, we'll hold it here. And if it ends up that it may end up being -- if turns out that it may end up being a problem, then we can move up.

MR. DOYLE: And like I said, we have let people know when it is, but I don't know who --

AUDIENCE MEMBER: Your Honor, may I say something to Mr. Doyle?

MR. DOYLE: Your Honor, I am told that lots of people have expressed interest in attending and there was concerns among them about whether there would be room or not, so perhaps a larger room would make sense.

THE COURT: I have reserved 17.

MR. DOYLE: Thank you, Your Honor.

THE COURT: Go ahead.

MR. VIADA: Thank you, Your Honor.

Defendant objects to one of the instructions in Question No. 1; that is, quote, "A nuisance, if it exists, is not excused by the fact that it arises from an operation that is in itself lawful or useful," unquote. The defendant objects that this is a comment on the weight of the evidence. The fact that the the property is unzoned may well not be an excuse, but it is certainly something that the jury can consider as to whether or not the project is abnormal or out of place in the location at which it is proposed.

And so to suggest to the jury that the unzoned nature of the property has no relevance to whether it is a nuisance we believe is an unfair comment on the weight of the evidence with respect to the fact that the property is unzoned. We would request that the Court remove that instruction from the charge.

THE COURT: Overruled.

MR. VIADA: I haven't written this objection down; but since the Court has now changed Question No. 1 to phrase the question in the future condition, Question No. 2 which relates to damages talks about damages that have been caused by the nuisance; that is, caused in the present tense by a nuisance. And I

would -- again, I think that -- and I've made this point in the earlier objections about the preliminary charge, but I just think there is a fundamental flaw in the whole idea that a prospective nuisance can be a basis for damages since damages need to have occurred in the past to be recovered. They can't -- it can't be something that will occur in the future and then be recovered on the basis of a prospective nuisance.

That's the nature of my objection to Question No. 2. It's tied to an existing nuisance and not a prospective one. And I don't have a suggested cure for it, because I don't believe it can be cured.

THE COURT: Well, what if I changed Question No. 2 to read: What sum of money, if paid now in cash, would fairly and reasonably compensate plaintiffs for their damages, if any, that will be proximately caused by the nuisance?

MR. VIADA: Well, again, that does make a very important assumption that the nuisance would be built in the future. I mean, consider it this way, Judge --

THE COURT: Of course, Question 2 is predicated on a yes finding to Question 1, which has the "if built" language now.

MR. VIADA: But it doesn't -- it's not

predicated on a finding that it actually will be built.

I mean, here is the problem in a practical sense. If you were to award mega millions in damages, it may be that the developers will think, "Well, we're not going to build it like this. We don't want to incur those kinds of damages."

So let's assume they don't build it. Would it be this Court's judgment that even if they decide not to build it, in light of the judgment, that the developers would still have to pay huge damages to compensate the plaintiffs for something that never gets built?

I think that's one of the really important flaws in the whole approach to giving an award of damages on the basis of something.

THE COURT: Mr. Doyle, what is the answer to that question? That is a question that has puzzled me in the past. What if they decide, no, never mind?

MR. DOYLE: Well, as a practical matter, I think they could then come in and suggest that the damages should be vacated. And I'm sure this will be appealed and whatnot.

I mean, the evidence of the testimony we have had is they're going to build this and this is permitted and they are ready to go. There has been no

suggestion that they are not going to build this. To me, that would be -- is a hypothetical issue for down the road if they completely change course.

MS. SOUTHWICK: May I weigh in, Your Honor?

THE COURT: Please, because I am concerned that suppose they say, "No, never mind," after plenary jurisdiction has expired. I have to confess. It is a question that has, as I said, puzzled me.

MR. VIADA: It gets to the point of being a ripeness question, Your Honor.

THE COURT: That's a way of putting it.

MS. SOUTHWICK: It appears to me, Your Honor, that this jury needs to be asked this question. And whether it becomes ultimately a part of the Court's judgment is a matter for later consideration, at least in part. In order for the Court to determine whether to issue an injunction, it seems to me the Court needs to know what the jury believes the measure of damages is.

THE COURT: In other words, it may or may not be appropriate for an actual judgment award of monetary damages, but it might be appropriate for the determination of whether to issue injunctive relief.

MS. SOUTHWICK: That's correct, Your Honor. We are not conceding at the moment that it would

not be appropriate for the entry of a judgment, but we do believe that that's --

MR. DOYLE: Regardless of the outcome, that's, I think, an argument we can have if and when we need to at that time.

MS. SOUTHWICK: Right.

MR. DOYLE: But it will be relevant potentially in the interim; and as Ms. Southwick said, appropriate for this jury to be asked.

MR. VIADA: And my objection to that is it is simply asking the jury for an advisory opinion on a matter that is, at this point, pretty obviously not a ripe issue for decision because there has been no damage experienced.

MS. SOUTHWICK: Although as I understand the evidence, Your Honor, there is testimony that damage has been experienced.

THE COURT: Well, there is evidence of damages that have been experienced, albeit contested; but there has been evidence of damages that have been experienced to date on the first element, not on the second.

MS. SOUTHWICK: Correct, Your Honor.

THE COURT: I do have some considerable reservations about this second element of damages --

i.e., loss of use and enjoyment -- since it is hypothetical; it has not occurred; we don't know what the various problems are or will be.

But out of an abundance of caution, I am going to submit this question, overrule the objection and reserve for another day what use, if any, to make of those answers if the jury reaches that question on another day.

MR. VIADA: May I approach, Your Honor? I have that set of proposed instructions.

THE COURT: Let me ask Ms. Southwick this: There has been some discussion in the past that plaintiffs concede that aesthetics alone is not a nuisance.

MS. SOUTHWICK: I believe that's correct, Your Honor. As I understand it, the testimony was also that the individual plaintiffs were not concerned with the actual look of the building, although I believe that the proposed instruction that defendants have offered which has the phrase "including the mere fact that it is big," we would dispute that that's just a question of aesthetics.

THE COURT: Yeah. I'm not proposing to insert the defendants' proposed instruction No. 2, but I have puzzled whether it might be appropriate to include

an instruction that says, "Mere aesthetics or the look of a structure is not a nuisance."

What's your reaction to that?

MS. SOUTHWICK: Well, I don't believe that it was raised by the evidence. As I understand the testimony and the evidence, there was no discussion of the actual look of the building as an issue that would support our claim for nuisance.

MR. VIADA: Well, I understand that everybody that came in didn't say, "Oh, yeah, we don't have anything to say about that," but there was testimony to the fact that it's a monstrosity; it's so big, it dominates the landscape; it's a monstrosity, things of that nature. And so there was testimony that people do have a problem with it in that it is --

THE COURT: Yeah, but that's actually the problem I have got with the proposed aesthetics instruction. And that's frankly the reason why -- the reason why I have not included it in my charge is I'm having a difficult time separating size with aesthetics. And I'm afraid if I include an instruction on aesthetics, it might be construed to include size, which I think might well be within the ambit of nuisance, which is defined as abnormal and out of place; and that might include size. So that's my concern.

MR. VIADA: Well, and I would take issue with the idea that a nuisance is something that is abnormal and out of place. It's something that substantially interferes with use and condition. The abnormal and out of place is simply a culpability part of the nuisance equation.

I don't believe that the mere fact that a large building in an unzoned area is a nuisance simply because it's a large building. And we take issue with the various impacts that the plaintiffs claim are nuisance-type impacts.

But unless nuisance law becomes a form of zoning law, then I think that it is inappropriate for the jury to assume that simply because, you know, this neighborhood has a lot of residences in it, that you can't build a building there.

It may well be that -- I mean, we know that right up the street there is a building, but there is -- hypothetically, you could create a building that would not have any of these impacts but it would still be huge. You know, you could have a building without windows, for example. You could have a building that is -- you know, that's 30 stories but it only has one residence on each floor so you have got 30 residents in this huge building. You could have it to where the

garage is completely boxed in and it has no lights. You could have a foundation designed so that it doesn't cause any cracks.

My point is that the bigness, the size -- the mere size of the building is not by itself a nuisance impact unless you adopt the idea that simply because something is abnormal and out of place in one neighborhood, that it can't be built there or that it is a nuisance because it's there.

And that to me is tantamount to saying that we can use the common law of nuisance to spot zone an acre of property and say, "You can't build something that's out of character."

That was a lot of plaintiffs' point, that the building is out of character for the neighborhood. We don't like it because it's big.

And that's the point I'm making with that instruction, Your Honor. That's instruction No. 2. And that's my objection and my request is that the Court submit instruction No. 2.

THE COURT: Understood. I'm refusing the defendants' proposed Instructions 1 through 7 and signing my refusal at this time.

Anything else?

MR. VIADA: Let's see. I'm not sure that

on the first -- on the ones other than 2, that I have protected the record by at least making the objection and making the request. I understand the Court's ruling in advance.

THE COURT: Go ahead.

MR. VIADA: All right. Question No. 1 asking the jury to disregard diminution in market value as a form of nuisance as opposed to form of damages, so we would request instruction No. 1 to be submitted.

THE COURT: It's refused.

MR. VIADA: Okay. No. 3 requests -- we request that defendants' proposed instruction No. 3 be submitted, because the phrase "abnormal or out of place" standing alone is an incorrect standard of law. The concept should include the instruction that the condition is abnormal or out of place in the sense that it creates inherent unreasonable danger.

THE COURT: Refused.

MR. VIADA: The defendant pled that coming to the nuisance is a problem for some of the plaintiffs in the sense that they bought properties with knowledge or instructive knowledge that this project was going to be built. And the jury should be instructed that it can consider that as a factor in determining whether the project creates a substantial interference with the use

of their property.  So we would request that No. 4 be submitted to the jury.

THE COURT:  I'm refusing that instruction, but there will be more discussion on the recently acquiring plaintiffs, I suspect, at another day.

MS. SOUTHWICK:  Thank you, Your Honor.

MR. VIADA:  Proposed jury instruction No. 5 is requested because the definition of project is not limited by what the city of Houston has approved the developers to build.

The current definition allows the jury to speculate whether discussions among the developers and emails introduced into evidence reflects what is currently proposed, despite the absence of any city approval for some of those suggestions.  It also allows the jury to speculate about whether the proposed building is something other than what the city has approved, either in permit approvals or in the settlement agreement between the defendant and the city.

It also goes to the point that I made earlier that one of the elements of a claim to enjoin a prospective nuisance has to be that the project is imminent; and without there being any constraint on what the proposed project is, it's impossible to tell from the jury's finding whether the proposal that the jury thinks

is the proposal is one that's even imminent or could be imminent, because it doesn't have city approval.

So I would request on jury instruction No. 5 that the Court add the phrase "and which the city of Houston has approved" to the end of the sentence. And I have submitted for the Court to consider proposed instruction No. 5 and request that the Court include that in the current definition in the charge.

THE COURT: Refused.

MR. VIADA: The defendant has objected to the charge as omitting predicate findings for the issuance of a permanent injunction. Out of an abundance of caution, I have tendered the clear and convincing evidence standard as applicable to the showing of a reasonably certain future harm and tender this jury instruction No. 6 as a correct statement of the standard and request that the Court submit that in connection with a jury question that would ask whether or not the future nuisance is imminent and reasonably certain.

THE COURT: Refused.

MR. VIADA: And finally, the defendant objects to the charge in that the issue of lighting was never tried -- or I'm sorry, that the issue of lighting was tried over a lack of pleadings objection by Mr. Cook. And because it's the defendants' position that the

pleadings failed to allege that lighting from the proposed garage is an anticipatory nuisance, the defendants request that the Court submit the jury instruction No. 7 that removes lighting as a potential basis for a finding of nuisance.

THE COURT: Refused.

MR. VIADA: Okay. That concludes the defendants' objections and proposed additions to the charge.

THE COURT: Anything else from the plaintiffs?

MS. SOUTHWICK: Nothing further, Your Honor.

THE COURT: Where are you guys on scheduling the geotech depositions?

MR. COOK: We are doing Mr. Ellman by -- we're doing Mr. Ellman by video at 8:00 or 8:30.

MR. DOYLE: 8:00 o'clock tomorrow morning?

MR. COOK: Yes.

MR. DOYLE: And we're doing Mr. Vogt this afternoon.

One issue, if I can raise an issue we've got, just to keep you updated on how the things are progressing. When we were here yesterday before we moved the schedule, my understanding was Mr. Vogt was flying in